No. 87-263

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

_____

RITA MAE SNYDER,

        Claimant and Appellant,

-vs-

SAN FRANCISCO FEED & GRAIN, Employer,
    and
EBI COMPANIES AND ORION GROUP,

        Defendant and Respondent.

_____

APPEAL FROM:  The Workers' Compensation Court, The Honorable Timothy
                Reardon, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Trieweiler Law Firm; Terry N. Trieweiler, Whitefish,
        Montana

    For Respondent:

        Garlington, Lohn & Robinson; Larry W. Jones, Missoula,
        Montana

_____

Submitted on Briefs:  Nov. 13, 1987

Decided:  December 31, 1987

Filed: JAN 31 1987

*Ethel M. Harrison*

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Rita Mae Snyder appeals the judgment of the Workers' Compensation Court finding that her evidence did not establish a compensable industrial accident. San Francisco cross-appeals on the issue of the propriety of certain hypothetical questions. We reverse.

The issues before the Court are:

1. Was there substantial credible evidence to support the Workers' Compensation Court's judgment that Snyder did not suffer a compensable industrial accident?

(a) Does a stress related injury require a "psychological reconstruction?"

(b) Does a compensable injury require a showing of physical impact?

(c) Does a compensable injury have to arise from a single incident?

2. Is the testimony of a treating physician entitled to greater evidentiary weight?

3. Did Rita Mae's counsel pose improper hypothetical questions?

Rita Mae was 47 years old at the time of her trial in August, 1986. She had been married to Vernon Snyder for 29 years and had six children. Her youngest remained in the family home. Rita Mae can no longer care for her husband or family, however.

On December 31, 1984, Rita Mae suffered a ruptured basilar tip aneurysm while performing her duties at San Francisco Feed & Grain (San Francisco) in Ronan, Montana. As a result of the ruptured aneurysm, Rita Mae suffered

extensive brain damage; she is confined to a wheelchair; she has vision deficiencies; her memory has been affected; her reasoning process has been impacted; she engages in inappropriate behavior and laughs or cries for no reason; and she has had a guardian appointed. Her condition is permanent.

Prior to the date of injury, Rita Mae's family did not have a history of aneurysms. She did not consume alcohol nor was she overweight. She had no history of high blood pressure. She alleges that her aneurysm ruptured as a result of job stress.

Rita Mae began her duties as a bookkeeper with San Francisco in May, 1982. Her duties included helping customers, recording the weight of trucks, answering the phone, balancing the cash register, doing daily sheets, posting receivables, helping with the statements, posting inventory, totaling inventory books, helping total the cost of sales, and occasionally helping proof the computer printouts. She shared these duties with her sister/co-employee, Helen Teigen.

Rita Mae was a conscientious, hard working employee. She was described as dedicated and concerned that her work was current and correct. She seemed happy with her work and never complained.

The situation at San Francisco changed dramatically in June, 1984, however. At that time, a new general manager assumed control of the San Francisco operation in Ronan.

San Francisco employees described the new manager's style as chaotic and antagonistic. The work place became disorganized. Management-employee relations deteriorated. A change in the procedure for dealing with customers resulted in slower service and unhappy customers. On one occasion, Rita Mae had to call the police to prevent violence between

the manager and a disgruntled customer who had been forced to wait several hours.

Rita Mae's work situation continued to deteriorate. The lack of organization and communication caused the work place to become more frantic. The changed procedures resulted in angry customers and employees. Although Rita Mae was the type of person who was bothered by bickering, she often had to deal with the unhappy customers and smooth employee dissatisfaction.

The seasonal increase in feed purchases during the winter months and a fire at San Francisco's main competitor further exacerbated the situation. During November and December, 1984, Rita Mae began working through her lunch hour and staying after hours in an attempt to stay current with her work. Although the overtime was not paid, she began to fear she would lose her job, the family's sole source of income.

Rita Mae's job situation began to take a toll. She lost her cheerfulness about her job. Friends and family noticed she looked more and more wrung-out. She seemed to be under a lot of pressure from work and always appeared nervous.

The day of her injury was unusual. Since December 31, 1984 was a Monday sandwiched between two days on which the business was to be closed, business was expected to be brisk. Nevertheless, the work force was only 7, rather than the usual 10 employees. In addition, Rita Mae had end-of-the-month bookkeeping to complete.

When she arrived at work that day, Rita Mae appeared fine. She soon looked fatigued, however. She had noted that an upsetting customer was scheduled for servicing that day. She also was having difficulty deciphering one of the manager's incomplete invoices. The unfinished invoice appeared to upset her. Shortly thereafter, Rita Mae was

found slumped over her desk and was later diagnosed as having a ruptured aneurysm.

The medical evidence received at trial consisted of the deposition testimony of 3 neurological specialists. The doctors were instructed to base all opinions on the medical standard of more likely than not. Generally, they are in agreement concerning Rita Mae's injury.

It is agreed that an aneurysm is a weak spot in a blood vessel analogous to a weak spot in an inner tube which expands and develops a balloon-like appearance; that Rita Mae's aneurysm developed sometime during her teenage years; that not all aneurysms rupture; that psychological stress elevates blood pressure; that increased blood pressure places increased pressure on the aneurysm, often resulting in rupture; and that intracranial aneurysms can rupture spontaneously without change in vascular pressure.

Dr. Richard Dewey is a neurological surgeon. Dr. Dewey examined Rita Mae upon her arrival in Missoula and confirmed that she had a ruptured aneurysm. Following a period of time necessary to stabilize Rita Mae's condition, Dr. Dewey performed a craniotomy in order to prevent a second rupture.

Prior to his deposition, Dr. Dewey stated that in his opinion, "the claimant's work was not in any way causally related to [the ruptured aneurysm]." Dr. Dewey's opinion was offered in response to a written request by counsel for San Franciso.

At his deposition, however, Dr. Dewey indicated that new information had since come to his attention.

Q. And do you still hold that opinion today?
A. Based on the information that I had as of 16 July '86 regarding Mrs. Snyder's work or what my impressions were of her job at that time, my opinion is still valid. It would be unfair for me--or not unfair, but inappropriate, I think to change that opinion. That is what I stated, and

- 5 -

that's what I believed at that time. And based on that same information, I would arrive at the same conclusion.

. . .

Q. When you say "information", is that information--A. Well--

Q. --about Rita Mae Snyder's work? A. I have been informed of some circumstances which, in fact, may have some causal relationship subsequent to my dictating that letter.

In addition, Dr. Dewey indicated that Rita Mae's stressful work environment could have aggravated the aneurysm.

Q. Did Mr. Jones mention any unusual changes in the work place or stressors in the work place when he asked for your opinions?

. . .

A. I do not see that [in the letter].

Q. Did Mr. Jones inquire whether it was medically possible that an increased work load or increased stress in the work place aggravated or accelerated Rita Snyder's pre-existing condition?

. . .

A. No, he did not.

Q. Would that information possibly have changed an opinion that you had given to Mr. Jones in response to his letter. A. I don't know. I guess it depends on what information he had given me. That's a question that's very difficult to answer even in retrospect. But, in practical terms, I think the more information that a physician has, the more appropriate and informed his answer may be.

Q. Dr. Dewey, would you agree that the following work situations more likely than not cause workers to experience stress: One, a disorganized procedure for handling customers; two, angry customers; three, poor communications with

- 6 -

management; four, increased work load; five, unusual and unpaid for overtime; and six, job duties that cannot be completed correctly?

. . .

A. Well, I don't think it requires a medical degree to answer those questions. Those all seem like stressful--that all seems like collectively a stressful work environment.

Q. When a worker experiences a stressful situation in their work place, is it medically possible and probable that that situation could cause them to suffer elevation in blood pressure?

. . .

A. Again, my feeling is that stress of any kind may lead to the transient--at least transient elevation of blood pressure. In our treatment of patients, once they arrive at the hospital, when we are attempting to reduce blood pressure, is to do the opposite. That is, to avoid all stressful circumstances. So, I can't say that a particular stress raises blood pressure; but it is possible and probable that stressful situations, regardless of their cause, may elevate blood pressure.

. . .

Q. Dr. Dewey, testimony at trial was offered to the following facts: That through the fall months of 1984, Rita Snyder worked progressively more unpaid overtime. That through the fall months of 1984, communication between the management and the employees at her place of work deteriorated. That during the fall months of 1984, the procedure for scheduling customers changed. The business operated in a less organized fashion, and further that one of Rita Snyder's job duties, that of balancing the till, became progressively more difficult because the manager would remove money from the till and not leave a note telling anyone how much or that he had done so. On December 6th, 1984, the business's closest competitor was destroyed by fire, and within a week Rita Snyder's job duties were increased both in customers she had to wait on and the bookkeeping that she had to do.

About this point in time Rita Snyder made comments about the job being a rat race. That she feared she would lose her job.

If the Court finds as fact some or all of those incidents, as I have related them, do those sound like incidents that would cause Rita to feel stress in her work place?

A. Those are, in my opinion and I think in most lay people's opinion--most lay people would agree are stressful.

Q. Is it medically possible that that chain of incidents aggravated or accelerated the ultimate result of Rita Snyder's basilar artery aneurysm?

. . .

A. If those--if that chain of events caused any significant change in blood pressure, then they would have a bearing; and that is an acceleration of the stress of the wall of the aneurysm.

Q. At the time of trial, testimony was offered concerning the following facts about December 31st, 1984: December 31st, 1984, was an unusually busy day. Rita Snyder's place of employment was short three or four employees of the normal number of ten. Rita had commented soon after coming to work that an unusually unpleasant customer was scheduled to come in and do business at her place of employment. The other bookkeeper that Rita Snyder shared duties with was busy with another job and couldn't help Rita with her customers and her work up in the front of her business place. When Rita came to work in the morning, she looked normal and fresh. And after approximately an hour, she looked tired and wrung out. And shortly before Rita's syncopal episode, Rita asked for help to decifer an invoice that had been incorrectly and incompletely filled out.

Assuming the Court finds as fact some or all of those incidents, are those incidents occurrences that would cause Rita to suffer stress in her work place.

. . .

A. What you're describing, again, sounds to me like it is entirely possible that that is a stressful circumstance, stressful situation. That that stressful situation could possibly have elevated blood pressure.

Q. Could the elevation of the blood pressure aggravate or accelerate the ultimate rupture of her basilar artery aneurysm? A. Any elevation of the mean arterial pressure will accelerate the rupture of an aneurysm. Let me rephrase that. Any elevation in mean arterial pressure predispose--predisposes an aneurysm to rupture because it can be directly--it will directly reflect itself in tension of the wall of the aneurysm.

Dr. Gary Cooney is a neurologist who practices in conjunction with Dr. Dewey. In his practice, Dr. Cooney regularly evaluates patients for stress-related conditions. He opined that he performs that type of evaluation more frequently than a neurosurgeon. Dr. Cooney initially reviewed Rita Mae's medical records at the request of a psychiatrist involved in Rita Mae's treatment. He also gathered additional information and continued to take part in Rita Mae's treatment. In his opinion, the rupture of Rita Mae's aneurysm was causally related to work stress.

Q. Dr. Cooney, do you have an opinion to a reasonable degree of medical certainty whether Rita Snyder's current problems are causally related to the ruptured aneurysm and its treatment? A. I do.

Q. What is your opinion? A. I believe that the rupture of the patient's aneurysm was related to the medical problems that she was experiencing at the time of the rupture which were exaggerated and aggravated by work stress which she had been experiencing for some time.

. . .

Q. Dr. Cooney, can you state whether or not the following situations more likely than not would cause a bookkeeper who also waits on customers to

- 9 -

experience stress: One, a disorganized procedure for handling customers; two, unsatisfied customers; three, poor communication with management; four, an increased work load; five, unusual and unpaid for overtime; and, six, job duties that cannot be completed correctly nor on time.

. . .

A. All of those conditions would probably increase an individual's level of stress.

Q. If each situation would increase an individual's level of stress, would several or all of those situations at the same time add additional stress?

. . .

A. They would.

. . .

Q. At the time of trial, Dr. Cooney, testimony was offered to the following facts concerning December 31, 1984: December 31, 1984, was an unusually busy day at Rita Snyder's place of employment. Rita Snyder's place of employment normally operated with ten employees and had six or seven working on December 31. Early in the morning of December 31, Rita commented that an unusually unpleasant customer was scheduled to come in and do business at her place of employment. The other bookkeeper who normally worked with Rita Snyder was busy with other job duties and was unable to help Rita with waiting on customers and some of the other job duties that Rita had to do. That December 31, 1984, was the day the end of the month bookkeeping was to be done on. The end of the month bookkeeping was an extra, additional duty in addition to Rita's normal job duties. When Rita Snyder came to work on the morning of December 31, she appeared normal. After one hour in the work place, she appeared wrung out. Shortly before Rita's syncopal episode at work, Rita asked for help from the other bookkeeper because she was unable to decipher some paper work that the manager had incorrectly and incompletely filled out.

Dr. Cooney, if the Court finds as fact those facts substantially as I have related them to you, is it--are those incidents such as would normally cause a worker to experience unusual stress?

. . .

A. I would think that those events would cause an unusual amount of stress.

Q. Is it medically possible that these incidents aggravated or accelerated the ultimate result of Rita Snyder's pre-existing basilar artery aneurysm?

. . .

A. Yes.

. . .

Q. Is it medically probable that Rita Snyder experienced a stress reaction to her work place generally after being exposed to stressful experiences over a period of time?

. . .

A. It's certainly possible that that occurred.

Q. Dr. Cooney, do you have an opinion, to a reasonable degree of medical certainty, whether Rita Snyder's aneurysm would have ruptured when it did if she had not been exposed to unusual work stress?

. . .

A. I do.

Q. What is your opinion?

. . .

A. I believe that it is more likely that the aneurysm ruptured when it did, presuming that she was exposed to the stresses that we have been discussing, than would have occurred had she not experienced that sort of stressful situation.

Dr. Albert Joern is a neurosurgeon and former medical school professor. Dr. Joern examined Rita Mae's records and concluded that it is more likely than not that there is a causal relationship between the unusual stress in her work place and the rupture of Rita Mae's aneurysm.

The central issues in the case at hand concerns the sufficiency of evidence presented by the claimant. It is well settled that decisions of the Workers' Compensation Court will be upheld upon a finding of substantial credible evidence. Tocco v. City of Great Falls (Mont. 1986), 714 P.2d 160, 163, 43 St.Rep. 310, 314. "However, when the critical evidence, particularly medical evidence, is entered by deposition, we have held that 'this Court, although sitting in review, is in as good a position as the Workers' Compensation Court to judge the weight to be given record testimony . . .'" Jones v. St. Regis Paper Co. (1982), 196 Mont. 138, 146, 639 P.2d 1140, 1144, citing Hert v. J. J. Newberry Co. (1978), 178 Mont. 355, 584 P.2d 656. We find the medical evidence, together with other evidence is sufficient to establish a compensable injury within the meaning of the Montana Workers' Compensation Act.

The Workers' Compensation Court found that Rita Mae was upset on the day in question; that stress causes an increase in blood pressure; and that an increase in blood pressure can cause an aneurysm to rupture. The court concluded, however, that there was insufficient evidence of work caused stress in the degree needed to elevate blood pressure. Such a conclusion is in stark contrast with the evidence presented at trial.

The medical experts unanimously agreed that the average person would deem Rita Mae's work place unusually stressful in the months immediately preceding her injury. The experts also agreed that the work environment on the day of the

injury was particularly stressful. San Francisco contends such evidence is not significant, however.

San Francisco places great reliance on the fact that human beings react differently to environmental stimuli. It is alleged that this variation and our decision in Campbell v. Young Motor Company (Mont. 1984), 684 P.2d 1101, 41 St.Rep. 1218, requires that a psychologist perform a "psychological reconstruction" demonstrating that Rita Mae found her work environment stressful. We disagree.

In Campbell, the issue was whether suicide is per se an independent, intervening cause which precludes the award of death benefits to an injured workers beneficiary. We held that suicide is compensable if the on-the-job injury produces post-injury trauma which causes the suicide. 684 P.2d at 1103, 41 St.Rep. at 1220. We did not set forth an evidentiary rule requiring a "psychological reconstruction" if psychological factors are involved. The "psychological autopsy" performed in Campbell was merely recognized as a method of establishing a nexus between the injury and resulting suicide.

In the instant case, Rita Mae's family and co-workers testified, inter alia, that Rita Mae was under a great deal of pressure from work; that she had been working progressively more unusual and unpaid overtime; that her job duties had become more difficult; that she had to deal with angry customers and employees; that the work place was disorganized; that there was poor communication with management; and, that she feared she would lose her job. There is no evidence that Rita Mae was an emotional zombie. The record discloses quite the opposite.

The medical experts agreed that Rita Mae's work environment was very stressful. Rita Mae's co-workers and family confirmed that Rita Mae was affected by the stress.

- 13 -

The testimony showed she appeared nervous all the time; she was thought to be under a great deal of pressure from work; and, she appeared wrung-out soon after arriving at work. We find the evidence is sufficient to demonstrate that Rita Mae found her work environment unusually stressful. As Dr. Dewey indicated, it does not take a medical degree to determine that the work environment was very stressful.

In the alternative, San Francisco contends that § 39-71-119, MCA (1983), which was controlling at the time of the rupture, precludes a finding of compensable injury absent a showing of physical impact. It provides:

> "Injury" or "injured" means: (1) a tangible happening of a traumatic nature from an unexpected cause or unusual strain resulting in either external or internal physical harm and such physical condition as a result therefrom and excluding disease not traceable to injury . . .

By its terms, the statute does not require that an injury arise from a specific instance of physical impact. "A tangible happening must be a perceptible happening . . . Some action or incident, or chain of actions or incidents, must be shown which may be perceived as a contributing cause of the resulting injury." Erhart v. Great Western Sugar Co. (1976), 169 Mont. 375, 381, 546 P.2d 1055, 1058. The stress induced increase in blood pressure which gradually expands a blood vessel to the point of rupture is such a chain of incidents. The fact that the injury producing stimulus is in the form of sustained emotional stress or strain does not make the impact on the body any less harmful or real. We hold that the unusual and unexpected mental strain of a stressful work environment which causes a pre-existing aneurysm to rupture is a tangible happening of a traumatic nature from an unusual strain. See Rathbun v. Tabor Tank Lines (1955), 129 Mont. 121, 283 P.2d 966 (unusual stress

and strain which causes injury is a compensable occurrence); Hoehne v. Granite Lumber Co. (1980), 189 Mont. 221, 615 P.2d 863 (tangible happening need not be a single, isolated incident); Jones, supra (claimant need not identify specific incident which causes injury); Wise v. Perkins (Mont. 1983), 656 P.2d 816, 40 St.Rep. 1 (excessive work week which results in phlebitis constitutes a tangible happening of a traumatic nature from an unusual strain); Tocco, supra, (emotional stress contributing cause of injury). By so holding, we join the overwhelming majority of jurisdictions which recognize aggravation of an aneurysm as a compensable injury. We note, however, that this opinion may be unique in light of the Legislature's subsequent modification of the injury statute. See § 39-71-119(3)(a).

The second issue before the Court concerns the evidentiary weight to be given the testimony of the treating physician. Rita Mae contends that the Workers' Compensation Court improperly gave the deposition testimony of Dr. Dewey, the treating physician, greater weight. As a general rule, we agree that the testimony of a treating physician is entitled to greater evidentiary weight. See generally Drescher v. Liberty Mutual Fire Insurance Co., WCC No. 8509-3254, decided February 11, 1986; Goodman v. Liberty Mutual, WCC No. 8502-2897, decided September 3, 1985. Logic indicates that the treating physician will normally have had more contact with, and greater knowledge of, the injured worker. As a result, the treating physician should generally be in the best position to give an informed opinion.

However, the treating physician rule is not cast in stone. In the instant case, Dr. Dewey indicated that his initial opinion was, in effect, based on incomplete knowledge. The court ignored Dr. Dewey's subsequent acknowledgement that it is possible and probable that the

unusually stressful work environment resulted in elevated blood pressure and that elevated blood pressure can cause an aneurysm to rupture.

In addition, Dr. Cooney also took part in the care and treatment of Rita Mae. He concluded that Rita Mae's unusually stressful work environment was causally connected to the subsequent rupture of the aneurysm. His opinion, which was affirmed by Dr. Joern, was also ignored, however. Under these circumstances, we agree that the court improperly relied upon Dr. Dewey's initial conclusion.

The final issue before the Court is the propriety of the hypothetical questions posed to the medical experts by Rita Mae's counsel. Although San Francisco objected to the hypothetical questions, the Workers' Compensation Court did not rule on the matter in light of its decision on the merits. We address the issue in the interests of judicial economy and final resolution of the controversy.

Although the Workers' Compensation Court was not generally bound by the rules of evidence at the time in question, the court has often looked to the Montana Rules of Evidence for guidance. San Francisco contends that the hypothetical questions, reproduced infra, were improper because the questions contained improper characterizations of the evidence, the facts relied upon were not proven at trial, and Dr. Joern relied upon information not communicated to the Court. Assuming, argumendo, that the stricter standard of the Montana Rules of Evidence did apply, we find no error.

A review of the record indicates that the alleged mischaracterization of the record did not occur. The facts contained in the hypothetical questions posed by counsel accurately reflect the testimony presented. We will not require counsel to engage in a verbatim regurgitation of prior testimony. See Graham v. Rolandson (1967), 150 Mont.

270, 435 P.2d 263. San Francisco's contention that the facts relied upon were not proven is similarly without merit.

Finally, we call San Francisco's attention to Rule 705, M.R.Evid. It provides:

> <u>Disclosure of facts or data underlying expert opinion.</u> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose of the underlying facts or data on cross-examination.

As Rule 705 indicates, an expert need not delineate the complete basis for his or her opinion prior to offering that opinion. Counsel for San Francisco thoroughly investigated the matter on cross-examination. We find no error.

The judgment of the Workers' Compensation Court is reversed with instructions to enter judgment in favor of Rita Mae Snyder.

_____
Justice

We Concur:

_____

_____

_____

_____
Justices