No. 92-354

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993


ROBERT PEPION,

      Petitioner and Appellant,

  -vs-

BLACKFEET TRIBAL INDUSTRIES,

      Employer,

  and

STATE COMPENSATION MUTUAL INSURANCE FUND,

      Insurer and Respondent.

**FILED**

APR 6 - 1993

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA


APPEAL FROM:   Workers' Compensation Court,
              For the State of Montana
              The Honorable Timothy W. Reardon, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

          Donald R. Marble, Marble Law Office, Chester, Montana

      For Respondent:

          Richard E. Bach, Legal Counsel, State Compensation Mutual Insurance Fund, Helena, Montana


**FILED**
Filed:

APR 6 - 1993

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:  March 11, 1993

Decided:  April 6, 1993

_____
                  Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment of the Workers' Compensation Court denying Robert Pepion's claim for workers' compensation benefits. Robert J. Campbell was appointed the hearing examiner and the findings and judgment prepared by him were adopted by the Workers' Compensation Court. We affirm.

While appellant Robert Pepion (Pepion) sets forth five issues to be considered by this Court, the primary and controlling issue is whether the findings and conclusions of the Workers' Compensation Court are supported by substantial and credible evidence.

Pepion, an employee of Blackfeet Tribal Industries, alleges that on August 22, 1985, he suffered a cerebral vascular accident (stroke) during the course and scope of his employment for the Blackfeet Tribe (Tribe). He submitted a claim for compensation on June 24, 1987, just two months short of two years after the date of the alleged accident. In his claim Pepion alleges that the injury was caused by "heavy lifting." A similar notation on the employer's first report of injury refers to "heavy lifting."

On the day of his alleged injury Pepion was working as maintenance supervisor for the Tribe. He was checking the thermostats and furnaces in the main Tribal building in Browning, Montana. He testified that in order to reach the furnaces on the roof of the building, he carried two ladders to a corner of the building. He placed the heavier ladder against the roof of a walkway and climbed to the top of the walkway. He then pulled the

2

lighter ladder to the roof of the walkway and used it to get to the roof of the building. He went up and down the ladders several times. On his last trip to the roof, he says, he felt tired and dizzy, and when coming down the first ladder he fell or slipped from the ladder to the roof of the walkway. He claims that he cannot remember coming down the second ladder to the ground or whether he took the ladders down himself. He was hospitalized that day in Great Falls and treated for stroke. Hospital records indicate that he had suffered a stroke while on the job.

Pepion took sick and annual leave until November 15, 1985. He then returned to work but due to problems on the job he lost his supervisor position and thereafter worked as a safety inspector until he was terminated in February 1988.

Pepion's statement that he was going up and down the ladders to the roof of the Tribal building first appears in a report by his family physician, Dr. Randolph Rottenbiller, dated November 22, 1988, more than three years after the date of the alleged accident. Shortly thereafter Melvin Running Rabbit, a security guard for the Tribe, signed a written statement dated December 22, 1988, which "reduced to writing [his] oral statement made to . . . [the] attorney for Robert Pepion, on September 11, 1987." The alleged conversation between Pepion's attorney and Mr. Running Rabbit took place over two years after Pepion's stroke of August 22, 1985. Mr. Running Rabbit's statement includes the following:

> I remember him going up and down a ladder to the roof to work on the furnace. . . . I saw him at one time on the ladders. He may have been up and down five (5) times, but I am quite sure it was at least twice.

3

In his deposition, however, Mr. Running Rabbit contradicted this statement. He said that he had seen Pepion going up and down the ladders a few days before, but not on the day of his stroke.

Two other Tribal employees were deposed in an attempt to ascertain whether anyone recalled Pepion's activities on the day of his stroke. Gerald Silvas, an electrician for Blackfeet Tribal Industries, was on the maintenance crew supervised by Pepion. He was at the shop on the morning of the alleged accident. Mr. Silvas testified that normally two people are needed to work on the heating and air conditioning units on the roof of the Tribal building. According to Mr. Silvas, Pepion was not qualified to go up on the roof and work on the units. Although Mr. Silvas was a member of the maintenance crew and normally the one who would work on the units, he was not aware that anyone had gone up on the roof on the day of Pepion's stroke.

Another member of the maintenance crew, Larry Jordan, was in the shop all morning on the day of Pepion's stroke. He was not aware that Pepion had ever gone up on the roof by himself to work on the furnaces, or that he had used the ladders to go up on the roof on the day of his stroke.

Pepion had a complicated medical history prior to the time of his stroke on August 22, 1985. It includes rheumatic valvular heart disease, an enlarged heart, and a prosthetic mistral valve implanted in 1964. He had a history of intermittent atrial fibrillation and ventricular dysrhythmia. Because of the artificial heart valve and his history of intermittent arterial

4

fibrillation, Pepion was at risk for blood clots and had been treated with Coumadin, an anti-coagulant medication.

On the date of Pepion's stroke and for several months prior to that time, his blood was tested for the time it took to form clots (prothrombin- or "pro"-time). During this period his pro-time levels were subtherapeutic, which meant that Pepion did not have enough Coumadin in his blood to prevent blood clots from forming in his system. Indian Health Service reports from 1979 on indicated that Pepion had a history of inconsistent compliance with his medical regime.

On the day of his stroke, Pepion was seen initially at Browning, and was then transported to Great Falls, where he was placed in the care of Dr. Larry Kincer, a cardiologist, and also was seen by Dr. Dennis Dietrich, a neurologist, for neurological problems.

Dr. Kincer stated in his deposition that Pepion's condition at the time of his stroke was such that he was "very prone to heart irregularities;" that his risk of embolization "would not be expected to be greatly increased by physical activity, whether it be walking to the bathroom or walking up a ladder to the roof;" and that Pepion's risk of stroke "would not be expected to be much different with some strenuous activity."

Dr. Dietrich stated in his deposition that Pepion "had plenty of reason to have a stroke regardless of any activity that he was or wasn't engaged in," and that the mechanism of the stroke as he believed it occurred "did not require the presence of any

5

exertion." In other words, Dr. Dietrich believed that Pepion's activity at work had no contributing effect on the stroke.

Pepion's attorney eventually referred him to two other medical specialists, Dr. Keith Weeks and Dr. Albert Joern. Dr. Weeks, a Kalispell cardiologist who saw Pepion for the first time in September, 1991, testified that it was medically possible that Pepion's work activity on August 22, 1985 aggravated his pre-existing condition. Dr. Joern, a Kalispell neurosurgeon, concluded after examining Pepion in August, 1989 that "it was medically possible for the physical exertion and events of August 22, 1985 to precipitate [Pepion's stroke]." But Dr. Dietrich, who had seen Pepion shortly after his stroke occurred and recalled Pepion's condition on the day of the stroke, reviewed Dr. Joern's report and disagreed with its conclusions because "some of his postulations are speculative, and others are clearly incorrect, in error."

Pepion's family physician in Browning, Dr. Rottenbiller, saw him shortly after his stroke and treated him thereafter. Dr. Rottenbiller's opinion was that Pepion's stroke was caused by a blood clot in his heart, which broke loose and travelled to his brain. He stated that "it's hard . . . to establish a cause-and-effect relationship between this clot breaking loose . . . and any activity that he was undergoing at the time." Dr. Rottenbiller concluded that given the subtherapeutic level of anti-coagulant medication in Pepion's blood that day, the stroke could have occurred at any time, and that medical evidence could not provide any degree of certainty as to the exact cause.

This Court will not substitute its judgment for that of the Workers' Compensation Court where there is substantial credible evidence to support the court's findings of fact. Laber v. Skaggs Alpha Beta (1991), 247 Mont. 172, 175, 805 P.2d 1375, 1377. Even though conflicting evidence may exist in the record, it is the duty of the Worker's Compensation Court, and not this Court, to resolve such conflicts. Smith v. United Parcel Service (Mont. 1992), 835 P.2d 717, 49 St.Rep. 629; Currey v. 10 Minute Lube (1987), 226 Mont. 445, 736 P.2d 113.

Here, the Workers' Compensation Court, faced with conflicting medical testimony from Doctors Joern and Dietrich, concluded that it should defer to the opinion of "the doctor with the greater knowledge of the claimant's medical condition," that is, Dr. Dietrich, who testified that Pepion's work activity had no contributing effect on his stroke and that the stroke could have occurred regardless of Pepion's physical activity. Dr. Dietrich's testimony was consistent with that of the treating cardiologist, Dr. Kincer, and Pepion's family physician, Dr. Rottenbiller. All three physicians concluded that if Pepion did climb ladders and work on the Tribal building's heating system on the day of his stroke, this activity played no role in his stroke.

Doctors Rottenbiller, Kincer, and Dietrich are or were the physicians who treated Pepion for his stroke and managed his care afterward. We hold that the Workers' Compensation Court properly accorded their testimony greater weight than that of Doctors Joern and Weeks, who did not see Pepion until four and six years,

7

respectively, after he had his stroke, and then only on referral by Pepion's attorney. See Snyder v. San Francisco Feed & Grain (1987), 230 Mont. 16, 27, 748 P.2d 924, 931, in which we held that as a general rule, the testimony of a treating physician is entitled to greater evidentiary weight.

In short, Pepion failed to demonstrate by a preponderance of substantial, credible evidence that his work activities on August 22, 1985 were causally related to the stroke he had on that date. The judgment of the Workers' Compensation Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____
_____
_____
Justices