No. 99-581

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 95

LOUIS NIELSON,

        Petitioner and Appellant,

    v.

STATE COMPENSATION INSURANCE FUND,

        Insurer and Respondent,

    and

TNT WELL SERVICING, INC.,

        Respondent and Employer.

APPEAL FROM:    Workers' Compensation Court, State of Montana,
                   The Honorable Mike McCarter, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Marvin L. Howe, Attorney at Law, Glendive, Montana

        For Respondent:

        David A. Hawkins, Special Assistant Attorney General, Montana State Fund,
        Helena, Montana

Submitted on Briefs:  August 8, 2002

Decided:  April 23, 2003

Filed:

———————————————————————
                   Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1      The Petitioner, Louis Nielson, petitioned the Workers' Compensation Court for the State of Montana to find that he is permanently partially disabled as defined in § 39-71-116(18), MCA (1993), and entitled to permanent partial disability benefits from the Respondent, State Compensation Insurance Fund, pursuant to § 39-71-703, MCA (1993). Following trial, the Workers' Compensation Court found and concluded that Nielson is not entitled to partial disability benefits and dismissed his petition. Nielson appeals from the District Court's findings, conclusions and judgment. We reverse the judgment of the Workers' Compensation Court.

¶2      The only issue on appeal is whether the Workers' Compensation Court's finding that the claimant Louis Nielson is not permanently partially disabled, is supported by substantial evidence.

## PROCEDURAL HISTORY

¶3      On February 8, 1999, Nielson filed a petition in the Workers' Compensation Court for the State of Montana in which he alleged that on April 18, 1995, he suffered an occupational disease in his left arm and an injury to his right arm arising out of and in the course of his employment with TNT Wells Servicing, Inc., located near Sydney, Montana. He alleged that at the time of his injury, his employer was insured by the Respondent, State Compensation Insurance Fund, and that as a result of his injury, he was permanently totally disabled as defined at § 39-71-116(19), MCA (1993), and entitled to benefits pursuant to § 39-71-702, MCA (1993).

¶4     The State Fund responded to Nielson's petition by admitting that he had sustained an injury to his right arm and an occupational disease in his left arm on the date alleged while employed by TNT and that TNT was insured at that time by the State Fund. The State Fund also admitted that his injuries had been properly reported but denied that he was totally disabled and denied that it had acted unreasonably.

¶5     Prior to trial, Nielson took depositions from his treating physician, Lofti Ben-Youssef, M.D., and Bob Zadow, a rehabilitation counselor who had evaluated his prospects for employment. Both depositions were filed with the Workers' Compensation Court and considered along with various exhibits and the trial testimony of Nielson, his wife Cynthia Nielson, Scott Ross, M.D., who had examined Nielson at the request of the State Fund, and Dennis McLuskie, a vocational consultant retained by the State Fund.

¶6     Following trial, the Workers' Compensation Court found that while the medical opinions conflicted regarding Nielson's ability to work, those opinions ultimately depended on his subjective complaints of pain and since the Workers' Compensation Court did not find Nielson credible, it was not persuaded that he had any physical impairment resulting from injury which precluded him from holding at least those light duty jobs identified by McLuskie. Those jobs included video rental clerk, retail sales person and auto sales person. Therefore, the Workers' Compensation Court concluded that Nielson was not permanently totally disabled and dismissed his petition.

¶7     On September 13, 1999, Nielson appealed the Workers' Compensation Court's judgment to this Court. However, on November 15, 1999, he filed a second petition for

3

hearing in the Workers' Compensation Court in which he alleged the same background facts as before but claimed that he was entitled to at least permanent partial disability benefits pursuant to § 39-71-703, MCA (1993). The State Fund again admitted the basic allegations in Nielson's petition but denied that he was entitled to permanent partial disability benefits and denied that it had acted unreasonably when it denied his claim.

¶8 On March 2, 2000, Nielson moved to stay proceedings in this Court related to the appeal from the Workers' Compensation Court's original judgment and transfer the record back to that court so that it could decide his petition for partial disability benefits. Following our order doing so, the parties stipulated that the record from the previous trial be submitted to the Workers' Compensation Court for resolution of the partial disability issue. On September 20, 2000, the District Court again entered findings of fact, conclusions of law and judgment. This time, that court added to its previous findings that there was a lack of persuasive objective medical evidence verifying Nielson's physical restrictions or that his ability to work was impaired and, based on the testimony of Dr. Ross, concluded that he had not sustained a permanent partial disability as defined at § 39-71-116(18), MCA (1993).

¶9 Nielson has appealed from the Workers' Compensation Court's most recent findings and judgment but does not argue on appeal that the Workers' Compensation Court erred when it dismissed his original petition for permanent total disability benefits.

FACTUAL BACKGROUND

¶10 At the time of trial, Louis Nielson was 49 years old. He has a high school education and prior work experience, including ranch work, logging, truck driving, and oil well service

4

which was his time of injury occupation.  Other than a brief and unsuccessful stint as a car salesman, his work history is limited to medium to heavy duty work.

¶11     While working for TNT Well Servicing, Inc., in the winter of 1995, he began experiencing numbness and pain in his left extremity from his fingertips to his elbow.  On April 18, 1995, while pulling at a hot oil hose at work, he developed the same symptoms in his right extremity.  On that date, he sought treatment for these conditions from Dr. Lofti Ben-Youssef, an orthopedic surgeon in Sydney, Montana.

¶12     Dr. Ben-Youssef testified by deposition.  He stated that when he first saw Nielson on April 18, 1995, he examined him and formed the opinion that he had bilateral cubital tunnel syndrome.  Cubital tunnel syndrome is a condition caused when the ulnar nerve becomes compressed as it passes through the cubital tunnel (in the middle part of the elbow) or subluxes (slips out of the tunnel), resulting in symptoms in the arm along the distribution of the ulnar nerve continuing into the fourth and fifth fingers of the hand.

¶13     Dr. Ben-Youssef first referred Nielson to a neurologist, Roger S. Williams, M.D., who examined him on May 15, 1995, felt that his symptoms were a result of "over use" of his upper extremities and suggested a wrist splint, time away from work, and possible surgical exploration in the future.

¶14     Following the consultation with Dr. Williams, and after a period of work avoidance, Dr. Ben-Youssef prescribed physical therapy.  When that aggravated Nielson's condition, he referred him to Curtis R. Settergren, M.D., an orthopedic surgeon who specializes in treatment of the upper extremities.  Dr. Settergren saw Nielson on September 26, 1995,

5

diagnosed lateral epicondylitis with symptoms of cubital tunnel syndrome and referred Nielson to Dr. Mary Gaddy, a neurologist, for nerve conduction studies. Those studies were done by Dr. Gaddy on August 3, 1995. As a result of those studies, Dr. Gaddy concluded that there was electrical evidence of bilateral cubital tunnel syndrome as well as bilateral carpel tunnel syndrome.

¶15 Carpel tunnel syndrome results from a compression of the median nerve as it runs through the carpel tunnel on the palm side of the wrist. Classically, it causes numbness, tingling, and pain and can involve the thumb, index finger and long finger. In other words, it involves the remaining parts of the hand not affected by the ulnar nerve. All the parties agree that nerve conduction studies are objective evidence of injury. Dr. Ben-Youssef testified that those objective findings were consistent with Nielson's symptoms.

¶16 By November of 1995, Dr. Ben-Youssef was advising Nielson to avoid anything that involved lifting and carrying.

¶17 In April of 1996, Nielson was referred by the Vocational Rehabilitation Service, which had been retained by the State Fund, to Thomas L. Schumann, M.D., a Billings physician who specializes in occupational and preventive medicine. Following his independent medical evaluation, Dr. Schumann also diagnosed bilateral cubital and carpel tunnel syndrome. He recommended that Nielson avoid repetitive grasping, holding or manipulating with either hand. He approved the job of video rental clerk for Nielson but disapproved jobs of front-end loader, heavy equipment operator, customer service employee and sales clerk.

6

¶18 By June of 1996, Dr. Ben-Youssef felt that Nielson was, at that time, completely disabled from employment.

¶19 In January of 1997, Nielson was again referred by the State Fund for an independent medical examination–this time by Dr. Bill S. Rosen, a physiatrist, who then practiced at the St. Vincent Hospital Rehabilitation Center in Billings. As objective findings of injury, Dr. Rosen listed in his report that Nielson had a positive Tinel's sign bilaterally at the elbows and both wrists and a positive reaction to the Finklestein test at the right upper extremity. His diagnosis included possible carpel tunnel syndrome and cubital tunnel syndrome on the right side and cubital tunnel syndrome on the left side. He recommended further testing but did not feel that Nielson had reached maximum medical recovery and, therefore, did not comment on his functional capacity other than to suggest that he was capable of performing the three light duty jobs suggested by the State Fund (sales clerk, video store clerk and car sales). At Dr. Rosen's suggestion, additional electromyography was done by Dr. Donald H. See, M.D., on February 26, 1997. Those studies were negative. Dr. Ross testified at trial, however, that nerve conduction studies produced false negatives fifteen percent of the time.

¶20 Following Dr. See's follow-up nerve conduction studies, Dr. Rosen expressed the opinion on September 17, 1997, that Nielson had right extensor pollicis tendinitis.

¶21 On February 27, 1997, Nielson was seen by Todd Dundas, an exercise physiologist who performed a functional capacity evaluation to determine Nielson's physical capabilities. In his follow-up report, he concluded that Nielson had given his best effort and that the results were valid. As a result of that evaluation, it was his opinion that Nielson could

7

perform some type of gainful employment, but would need to limit his upper extremities to only occasional use and have assistance lifting over forty pounds. It was his opinion that, as a result of his physical impairment, Nielson would now be limited to light to medium duty work.

¶22 By April of 1997, after review of Dundas's functional capacity evaluation, Dr. Ben-Youssef was of the opinion that Nielson could engage in no employment using the upper extremities. He explained on a later date that while Nielson could perform the three jobs suggested by the State Fund in the short term, he would periodically have to rest his arms for days due to the pain caused by their regular use. On May 11, 1998, he arrived at a physical impairment rating for Nielson equal to fifty percent of the whole person. The impairment rating was based in part on the objective findings of neurologist Mary Gaddy, M.D. In a letter dated May 11, 1998, Dr. Ben-Youssef explained to Dennis McLuskie, a vocational consultant retained by the State Fund, that he had reviewed the job descriptions for the positions being suggested for Nielson but that he did not feel he was capable of performing those jobs on a regular basis.

¶23 Over the course of his treatment, Dr. Ben-Youssef treated Nielson by splinting, physical therapy, medication and avoidance of activity.

¶24 The State Fund next referred Nielson to a three-member panel of physicians who examined him on September 4, 1998. The panel included Robert S. Schultz, M.D., an orthopedic surgeon, Patrick J. Cahill, M.D., a neurologist, and Scott K. Ross, M.D., an occupational medicine specialist.

¶25 Dr. Schultz, during his examination, observed "palpable snapping of the ulnar nerve at the elbow which appears to be secondary to subluxation of the ulnar nerve out of the cubital tunnel." He formed the impression that Nielson had ulnar nerve subluxation syndrome with discomfort secondary to cubital tunnel syndrome and felt there was some emotional overlay involved as well. He suggested that if no additional objective findings were made, Nielson should be referred to Mayo Clinic for further evaluation.

¶26 Dr. Cahill found positive Tinel's signs at both elbows over the ulnar nerve groove but found no abnormality following additional nerve conduction studies. His impression was that Nielson suffered from bilateral medial epicondylitis.

¶27 Dr. Ross found no positive signs of injury and diagnosed subjective complaints of right and left upper extremity pain. He recommended two weeks of work hardening preceded by another functional capacity evaluation and followed by a third functional capacity evaluation.

¶28 On October 5, 1998, after meeting, the three panel members (Schultz, Cahill and Ross) issued a report to McLuskie in which they stated as follows:

> The consensus opinion is to pursue the plan outlined by Dr. Ross . . . specifically recommending a work conditioning program of approximately two weeks' duration with an entry and exit functional capacity evaluation. Following the work conditioning program and exit functional capacity evaluation, alternative job analysis could be considered, but we do not feel comfortable with making such recommendations based on his most recent functional capacity evaluation having been done one and one-half years ago. There is a possibility that the functional capacity evaluation repeat would be indicative of the ability of the patient to return to his previous job . . . .

¶29 On October 27, 1998, presumably based on the panel's evaluation and

9

recommendation, Dr. Ben-Youssef prescribed a two-week work conditioning program preceded and followed by a functional capacity evaluation. Those evaluations and that program were administered by physical therapist, Ron O'Neill, on November 2, 1998. As part of his evaluation and examination of Nielson, he made numerous objective findings including bilateral scapular protraction and increased thoracic Kyphosis with forward head posture, positive Tinel's sign on the left wrist, positive Phelan sign on the left wrist, slightly positive Adson's test with a diminishing of the pulse on the left, and positive Finklestein's test bilaterally. He formed the opinion that Nielson put forth maximal effort but noted that his participation in the work hardening program was limited due to his bilateral elbow, wrist and hand pain which was easily aggravated. Following the unsuccessful work hardening program, he noted that no significant changes were noted in Nielson's substantially limited functional capacity and formed the opinion that Nielson is not a likely candidate for further work conditioning and that the probability of him holding any sort of job was questionable based on the findings from his evaluation. As far as the three jobs suggested by the State Fund, he formed the opinion that Nielson was unable to perform the demands of any of the three jobs.

¶30    Inexplicably, however, following receipt of O'Neill's report and without the benefit of any intervening or additional exams, tests, or evaluations, Dr. Ross wrote to the State Fund, stated that he disagreed with O'Neill's report and expressed the opinion that Nielson could not only return to the three positions suggested by the State Fund but that he could return to his time of job injury. He stated that he would not restrict his activities in any way

10

and that he needed no further medical treatment.

¶31 Dr. Ben-Youssef, on the other hand, who had seen Nielson two weeks before his deposition taken on March 31, 1999, and 18 to 19 times altogether over the preceding four years, and who had reviewed O'Neill's report and the panel's report, felt that Nielson's reports of pain were consistent with his initial diagnosis and that his response to that condition had been appropriate. Finally, he expressed the opinion that because of the aggravation to his injured extremities caused by work activity, regular employment would be difficult and at times impossible. Dr. Ben-Youssef testified that in his opinion Ron O'Neill's test results were valid and that, based on his four years of experience treating Nielson, he disagreed with Dr. Ross's evaluation and opinion.

¶32 Prior to trial, Bob Zadow, a rehabilitation counselor retained by Nielson, testified by deposition that, based on Nielson's medical records and O'Neill's evaluation, there was no work he was aware of that Nielson could perform with his limitations.

¶33 Dennis McLuskie, the vocational consultant retained by the State Fund, testified at trial that in his opinion Nielson is capable of returning to his time of injury job or the three light duty jobs that he researched. However, he admitted that his opinion was based on the medical opinion given by Dr. Ross and that in order to arrive at that opinion, he had to ignore what he had been told by Nielson, Dr. Ben-Youssef and Ron O'Neill, as well as the earlier functional capacity evaluation done by Todd Dundas.

¶34 Following the testimony given at the Workers' Compensation Court, the Court recessed and reconvened at the office of Dr. Ross. Dr. Ross testified consistent with his

11

previous reports and explained that he rejected O'Neill's functional capacity evaluation based on the lack of objective findings and Nielson's inability to participate in the work hardening program. However, on cross examination, he agreed that the Tinel's sign, Phelan's sign, and the results from the Finklestein test all included objective components. He also conceded that in addition to O'Neill, Dr. Rosen had recorded all of these findings as objective findings. He agreed that the more you see a patient and treat him, the better you can diagnose his condition, and for that reason he agreed that generally a treating physician is in a better position to render an opinion about his patient.

¶35    The Workers' Compensation Court found that the issue of whether Nielson had a physical restriction as a result of injury which impaired his ability to work depended solely on Nielson's credibility regarding his complaints of pain and that it did not find those complaints credible. The court found no persuasive objective medical evidence of an injury that would impair Nielson's ability to work. On the other hand, the court found Dr. Ross' testimony credible and persuasive. On that basis, it concluded that Nielson was not permanently partially disabled as defined at § 39-71-116(18), MCA (1993), and that he was not entitled to partial disability benefits pursuant to § 39-72-703, MCA (1993).

ISSUE

¶36    The issue on appeal is whether there was substantial credible evidence to support the Workers' Compensation Court's finding that the claimant, Louis Nielson, did not have a physical restriction resulting from injury which impairs his ability to work.

12

STANDARD OF REVIEW

¶37    We review a Workers' Compensation Court's findings of fact to determine whether they are supported by substantial credible evidence. *Williams v. Plum Creek Timber Co.* (1995), 270 Mont. 209, 212, 891 P.2d 502, 503. Substantial evidence is such evidence as will convince reasonable persons and on which such persons may not reasonably differ as to whether it establishes the prevailing party's case. *Cameron v. Cameron* (1978), 179 Mont. 219, 228, 587 P.2d 939, 945-46; and *Kukuchka v. Ziemet* (1985), 219 Mont. 155, 157-58, 710 P.2d 1361, 1363.

¶38    This Court may not substitute its judgment for that of the trial court when the issue relates to the weight given to certain evidence or the credibility of witnesses. *Burns v. Plum Creek Timber Co.* (1994), 268 Mont. 82, 84, 885 P.2d 508, 509. However, when evidence is produced by medical deposition, this Court is in as good a position as the Workers' Compensation Court to judge the weight to be given that testimony. *Shupert v. Anaconda Aluminum Co.* (1985), 215 Mont. 182, 187-88, 696 P.2d 436, 439.

¶39    As a general rule, testimony of a treating physician is entitled to greater evidentiary weight than that of other doctors. *Snyder v. San Francisco Feed & Grain* (1987), 230 Mont. 16, 27, 748 P.2d 924, 931; and *Pepion v. Blackfeet Tribal Industries* (1993), 257 Mont. 485, 489, 850 P.2d 299, 302.

DISCUSSION

¶40    Louis Nielson's injury occurred on April 18, 1995. Therefore, his claim is governed by the 1993 version of the Workers' Compensation and Occupational Disease Acts.

13

*Buckman v. Montana Deaconess Hosp.* (1986), 224 Mont. 318, 321, 730 P.2d 380, 382.

¶41　Permanent partial disability benefits are defined at § 39-71-116(18), MCA (1993), which states as follows:

> "Permanent partial disability" means a condition, after a worker has reached maximum medical healing, in which a worker:
>
> (a) has a medically determined physical restriction as a result of an injury as defined in 39-71-119; and
>
> (b) is able to return to work in some capacity but the physical restriction impairs the worker's ability to work.

¶42　In this case, Nielson has not appealed the Workers' Compensation Court's finding that he is not permanently totally disabled. Therefore, we limit our consideration to whether there is substantial evidence to support the finding that he is not permanently partially disabled.

¶43　On appeal, Nielson contends that the trial court's finding that he is not permanently partially disabled is not supported by substantial evidence. He contends that the only evidence that he is able to return to employment without limitation is the testimony of Dr. Scott Ross, whose testimony is not credible because it is without adequate foundation and internally inconsistent.

¶44　Not surprisingly, the State Fund responds that Dr. Ross's testimony is sufficient to support the Workers' Compensation Court's finding, that Dr. Ben-Youssef's testimony was based strictly on Nielson's subjective complaints and that the Workers' Compensation Court was in the best position to determine whether Nielson was credible.

¶45 Without meaning to infer that objective evidence is always necessary or even available for diagnosis of an injury, we conclude that the Workers' Compensation Court erred when it found no objective evidence of physical restrictions which impair Nielson's ability to work. We also conclude that the evidence relied on by the Workers' Compensation Court to find that Nielson's ability to work was unimpaired was not substantial credible evidence and that all of the substantial credible evidence was to the contrary.

¶46 Louis Nielson was examined for the injuries which are the subject of this claim by ten physicians, an exercise physiologist and a physical therapist whose reports are included in the record. Some form of injury was diagnosed by every doctor who saw Nielson other than Dr. Ross. Objective signs of injury, including positive electrical studies done in a fashion not done by other physicians, were observed by Dr. Mary Gaddy, Dr. Bill Rosen, Dr. Robert Schultz, Dr. Patrick Cahill and Ron O'Neill. Dr. Ben-Youssef, who saw Nielson as a treating physician on 18 or 19 occasions over a four-year period testified that Nielson's complaints were consistent with his diagnosis and that Nielson's response to his condition had been appropriate. Both healthcare providers who had examined Nielson for the purposes of measuring his functional capacity concluded that he was unable to return to his time of injury employment and that he had physical limitations on his ability to work.

¶47 Of all the physicians who had seen Nielson, only Dr. Ross expressed the opinion that Nielson had no physical restriction which impaired his ability to work. However, that opinion is inconsistent with Dr. Ross's initial representation that he was not in a position to make a representation regarding Nielson's return to work without a current functional

15

capacity evaluation. The only functional capacity evaluation done following that initial opinion by Dr. Ross was the one done by Ron O'Neill. Ron O'Neill stated unequivocally that Nielson was not capable of returning to his time of injury employment or any other employment. The record does not indicate that any additional information was provided to Dr. Ross from the date of his original opinion and his testimony on which the Workers' Compensation Court relied. The fact remained at the time of trial that if Dr. Ross was not capable of expressing an opinion about Nielson's ability to return to work on October 5, 1999, neither was he in a position to express that opinion at the time of trial. Therefore, we conclude that Dr. Ross's trial testimony on which the Workers' Compensation Court relied was not substantial credible evidence.

¶48 The undisputed evidence submitted to the Workers' Compensation Court was that at the time of his injury, Louis Nielson was capable of earning $9 per hour servicing oil wells for his employer. Assuming, for the limited purposes of this appeal, that he is capable of returning to any employment, the only evidence of employment to which he could return were the clerk and sales positions identified by Dennis McLuskie. The auto sales position is based on commission and Nielson's previous experience in that occupation was unsuccessful. The two clerk positions paid a maximum of $5.50 per hour but it was Dr. Ben-Youssef's opinion that Nielson could not engage in those occupations on a regular basis.

¶49 We conclude, therefore, that based on the only substantial credible evidence offered at the time of trial, Louis Nielson has sustained a work-related permanent partial disability as defined at § 39-71-116(18), MCA (1993), and is entitled to permanent partial disability

16

benefits as provided for at § 39-71-703, MCA(1993), based on the difference between what he was capable of earning in his time of injury employment and what he is capable of earning on a part-time basis as a sales clerk or video store clerk, earning $5.50 per hour.

¶50    For these reasons, the judgment of the Workers' Compensation Court is reversed and this case is remanded to the Workers' Compensation Court for further proceedings consistent with this Opinion.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ JIM REGNIER
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ JIM RICE

17

Justice W. William Leaphart dissenting.

¶51    For the reasons set forth below, I dissent.

¶52    The Workers' Compensation Court found "a lack of persuasive objective medical evidence verifying physical restrictions of claimant's use of **either** of his arms impairing his ability to work. Objective medical evidence relating to the right arm is particularly lacking." The court also did not find Nielson credible and believed he exaggerated his pain in both his testimony and his reports to doctors.

¶53    In support of these findings, the court noted that Dr. Ben-Youssef's opinion was based on Nielson's subjective complaints, which the court did not find credible. The court also noted that, although Dr. Gaddy's 1995 EMG testing found evidence of right and left carpal tunnel syndrome, "[m]ore recent testing and the opinions of other physicians cast serious doubt on the validity of her studies and diagnoses. Moreover, Dr. Ross testified that the methodology used by Dr. Gaddy is questioned in mainstream medical circles. I am not persuaded by Dr. Gaddy's findings."

¶54    A review of the record reveals substantial, credible evidence to support these findings. Dr. Ben-Youssef testified by deposition that his diagnosis was based on the information provided to him by Nielson and on Dr. Gaddy's diagnosis, neither of which the court found persuasive. Dr. Ben-Youssef testified that, "the severity of the diagnoses are based on his subjective complaints. . . . It's all based on the pain complaints."

¶55    Several letters in the record written by Dr. Ben-Youssef to the State Fund claims adjuster indicate his opinion is based on Nielson's subjective complaints. In August 1997,

he wrote, "[Nielson] does not need any additional treatment and the patient can perform in the short term in any of the three jobs that you sent me as sales clerk, video rental clerk and auto sales person, but the patient does have intermittent subjective severe pain of both upper extremity [sic] forcing him to stop any kind of activity for days." In May 1998, he wrote, "[t]he patient has intermittent pain of the upper extremity with any activity, and all the jobs that you sent me do include that. I do not think the patient will be able to do them based on his subjective complaints."

¶56 A review of Dr. Ben-Youssef's medical records for Nielson reveals the following notes:

| | |
|---|---|
| June 27, 1995: | The physical examination is within normal limit[s]. |
| July 11, 1995: | The physical examination shows no tenderness at the level of the extensor origin of the left wrist nor the flexor origin. No tenderness at the level of the cubital tunnel and minimal restriction of the range of motion of left wrist. |
| September 10, 1996: | The physical examination is unchanged. |
| February 8, 1997: | The physical examination is unchanged. |
| June 18, 1997: | The physical examination is unchanged and the patient still complains of intermittent pain of both hands. |
| September 5, 1997: | His physical examination is unchanged. |
| October 31, 1997: | His physical examination is unchanged. |
| February 10, 1998: | The physical examination is unchanged. |
| August 31, 1998: | The physical examination is unchanged. |
| February 19, 1999: | The physical examination is unchanged. |

¶57 I would conclude that substantial, credible evidence supports the Workers' Compensation Court finding that Dr. Ben-Youssef's opinion was based on Nielson's subjective complaints.

¶58 Although the Workers' Compensation Court rejected Dr. Gaddy's EMG and the opinions of Dr. Ben-Youssef and O'Neill, the court listed the medical evidence it did find persuasive. This evidence included: Dr. Williams's findings from 1995 that "no abnormalities were found on neurophysiological testing;" Dr. Settergren's diagnosis of *left* lateral epicondylitis; Dr. Rosen's 1997 diagnosis of tendonitis and possible chronic pain syndrome; Dr. See's normal EMG results in 1997; Dr. Cahill's normal EMG results in 1998; Dr. Schultz's finding of no obvious weakness or atrophy in the muscles of either arm and an obvious "psychiatric overlay;" and Dr. Ross's finding that no objective evidence supported Nielson's claims of right or left upper extremity pain.

¶59 The Workers' Compensation Court appropriately weighed the evidence and that court is in a better position to resolve conflicting medical evidence. The court heard live testimony from Nielson and Dr. Ross, in addition to considering the deposition testimony of Dr. Ben-Youssef. There is substantial, credible evidence supporting the court's rejection of Dr. Ben-Youssef's opinion.

¶60 Finally, Nielson argues, and this Court concludes, that Dr. Ross's reasoning was inconsistent because Dr. Ross initially stated that he was not satisfied with the 1997 FCE but later expressed his opinion that Nielson could return to his time of injury job without relying on O'Neill's subsequent FCE. Nielson contends that this also implicates the opinions of the

20

other two panel doctors because they did not express separate opinions, but simply concurred in Dr. Ross's opinion.

¶61    The medical panel expressed their opinion by letter, stating:

> The consensus opinion is to pursue the plan outlined by Dr. Ross beginning on page seven and extending to page eight of his note, specifically recommending a work conditioning program of approximately two weeks duration with an entry and exit functional capacity evaluation. Following the work conditioning program and exit functional capacity evaluation, alternative job analysis could be considered, but we do not feel comfortable with making such recommendations based on his most recent functional capacity evaluation having been done one and a half years ago.

¶62    Subsequent to this letter, Nielson was seen by O'Neill and participated in an entry FCE, a two-week work conditioning program and an exit FCE. Nielson was only able to participate approximately one half hour per day in the work conditioning program. Dr. Ross testified that work conditioning programs generally last between four and six hours a day. Nielson also missed four of ten scheduled visits due to pain from the activities involved. O'Neill's recommendation at the end of this program was, "Mr. Nielson is not a likely candidate for further Work Conditioning. Holding a job of any sort is questionable according to findings from the FCE and attempted Work Conditioning."

¶63    After reviewing O'Neill's report, Dr. Ross sent a letter to the State Fund concluding that, "there is no objective evidence that this gentleman could not return to his job of injury. . . . I would not restrict this patient at this time based on the panel examination, my interview/ evaluation and the functional capacity evaluations recently performed. It's my opinion that he could return to his job of injury without limitation or restriction."

21

¶64 Nielson argues that Dr. Ross indicated he would not express an opinion on Nielson's work capability until an FCE was completed and then, "when Dr. Ross was not satisfied with the [FCE], he went ahead and expressed an opinion." Nielson argues that this demonstrates Dr. Ross's reasoning was flawed and should not have been accepted by the Workers' Compensation Court.

¶65 At the hearing, Nielson asked Dr. Ross about this inconsistency.

Q: But if you felt uncomfortable giving any kind of an indication that my client could return to work until he did that, why didn't you then say, well, I reject . . . Mr. O'Neill's report, I want to do another one, functional capacity and work hardening before you rendered an opinion?

A: I can speak for myself, not Dr. Cahill or Dr. Schultz, but from my standpoint, first of all, I want to get the most current information, and the FCE that was available to us was a year or year and a half old. That was number one. Number two, when I did review Mr. O'Neill's report, and this is not a reflection on Mr. O'Neill, the fact that I disagree with the way he phrased things is one thing, but I think his report is quite illuminating in the sense that it does point out the lack of participation, the symptom magnification, the decrease in strength and grip as just one example over the course of a conditioning program. That rendered the test, in my opinion, invalid. Therefore, in a situation like that, I frankly feel there is absolutely no benefit to the patient, the employer or any of the other stakeholders in the system in continuing to get [FCE's] or work conditioning or work hardening programs if a person is not going to participate or cooperate. Therefore what, I have to base my decision on and what we as a panel based our decision on, because this was a consensus opinion, was the findings at the time of the examination. And those findings were subjective complaints without objective correlation.

¶66 The court's finding on this issue stated, "Having reviewed the FCE report, listened to Dr. Ross's explanation at trial, and observed claimant's own testimony, I am persuaded by Dr. Ross's evaluation of the O'Neill FCE. . . . Thus, I find no objective medical basis

22

for concluding claimant suffers any particular physical restriction resulting from injury to his right arm."

¶67    Based on a review of the record, I would hold that there is substantial, credible evidence supporting this finding.  Dr. Ross's testimony explains sufficiently that, based primarily on Nielson's lack of participation in O'Neill's FCE, the FCE was invalid and he did not feel another FCE would be useful.

¶68    Having reached its finding, the court correctly concluded that Nielson was not permanently partially disabled according to § 39-71-116(18), MCA (1993).  Accordingly, the Workers' Compensation Court did not err in denying Nielson permanent partial disability benefits.

¶69    I dissent.

/S/ W. WILLIAM LEAPHART


Chief Justice Karla M. Gray joins in the dissent of Justice Leaphart.

/S/ KARLA M. GRAY