No. 90-559

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

RANDY L. McINTYRE,

     Claimant and Appellant,

  -vs-

GLEN LAKE IRRIGATION DISTRICT,

     Employer,

  and

STATE COMPENSATION INSURANCE FUND,

     Insurer and Respondent.

**FILED**

JUN 13 1991

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    Workers' Compensation Court
                The Honorable Timothy Reardon, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Roger M. Sullivan; McGarvey, Heberling, Sullivan &
          McGarvey, Kalispell, Montana

     For Respondent:

          Mark Stermitz; Warden, Christiansen, Johnson & Berg,
          Kalispell, Montana

Submitted on Briefs:  March 21, 1991

Decided:  June 13, 1991

Filed:

_____
          Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

The claimant and appellant, Randy L. McIntyre, appeals the judgment of the Montana Workers' Compensation Court that his disability resulting from thoracic outlet syndrome had not been proven by a preponderance of the evidence to result from his 1987 injury. We affirm.

The following issues are on appeal:

1. Did the Workers' Compensation Court err in concluding that the claimant's thoracic outlet syndrome did not result from his 1987 injury?

2. Is the claimant entitled to temporary total disability benefits as a result of his 1987 injury?

3. Is the claimant entitled to permanent partial disability benefits as a result of his 1987 injury?

4. Is the claimant entitled to costs, attorney's fees, and a penalty award?

McIntyre was injured in an industrial accident in the course of his employment with Glen Lake Irrigation District on May 9, 1987, near Eureka, Montana. He was attempting to change a flat tire on a heavy equipment trailer when the jack he was using began to tip. While reaching under the trailer to try and release the jack, the jack slipped and the trailer came down; the trailer tire struck McIntyre's chest and pinned him to the ground.

McIntyre's wife discovered him under the trailer and, after jacking up the trailer to remove the claimant from under the tire, sought help in taking him to Dr. Andrew Ivy, a physician in Eureka.

2

Dr. Ivy diagnosed the claimant as having suffered a fractured left clavicle and chest contusions. He prescribed medication for the pain and put McIntyre's arm in a sling. Two days later he set the fractured clavicle in a cast and x-rayed it. He saw the claimant several more times to check the claimant's progress, the last time being June 15; on that occasion, he advised the claimant to return in one month for another x-ray. Dr. Ivy's records indicate that McIntyre did not return one month later. Dr. Ivy never did remove the claimant's cast and it was not until McIntyre suffered a second work-related injury in 1988 that Dr. Ivy saw him again.

As a result of the 1987 injury, McIntyre missed approximately three months of work. He and his wife agreed with the employer that McIntyre's wife would perform his regular job duties during this time, in return for which the employer would pay McIntyre his usual wage.

On May 15, 1988, McIntyre was injured in a second industrial accident arising out of his employment with Glen Lake Irrigation District. While standing in waist-deep water attempting to clear a beaver dam from a ditch, he pulled a small log out of the ditch and turned to throw it over his right shoulder when he felt a "pop" in his back. He immediately felt a pain in his neck and right shoulder area, and noticed numbness and tingling in his right arm. The claimant finished the work day and returned to work the next day.

The soreness continued, however, so he reported the injury to his employer and went to see Dr. Clay McDonald, a chiropractor in

3

Eureka. Dr. McDonald referred McIntyre to Dr. Ivy. Upon examining the claimant on May 23, 1988, Dr. Ivy found him to have pain in the right shoulder area when he turned his head to the right. Dr. Ivy also found that the right rotation of McIntyre's head caused a sensation going down McIntyre's right arm into the fingers. Dr. Ivy made the following diagnosis:

> I thought he had done something in his neck by that sudden motion, that pinched one of his cervical nerves, and therefore I gave him a collar to wear and I gave him some cortisone, a good dose to take. And at that date he brought Doctor McDonald's X-rays which showed a slight degeneration of the disc between cervical 5 and 6 with some spurring, and I assumed that was probably the source of his problem.

Dr. Ivy saw McIntyre again on May 27, 1988. The claimant returned to work on June 1, 1988. He ceased working June 12, 1988, because of pains in his neck, right shoulder and right arm, including tingling and numbness.

Dr. McDonald, the chiropractor in Eureka, referred McIntyre to Dr. Stephen Martini in Kalispell. Dr. Martini has no board certification but limits his practice to "spine rehabilitation." During his first visit with the claimant on July 12, 1988, Dr. Martini obtained a history from McIntyre which included a description of the 1988 injury, but not the 1987 injury; that history reflected that McIntyre noticed pain in the low thoracic area toward the end of the day on which the May, 1988 injury occurred. Dr. Martini assessed the claimant's problems as right thoracic outlet syndrome (TOS), cervical spondylosis and a possible bulging cervical disc. On August 17, 1988, his assessment continued to include cervical spondylosis and a bulging cervical

4

disc, but made no mention of TOS. Dr. Martini was not advised of the 1987 injury until April 20, 1989. Occupational therapist Tim Tracy also obtained a history from McIntyre in July, 1988; again McIntyre made no mention of the 1987 injury when indicating problems with his right arm and shoulder.

For reasons not entirely clear on the record, McIntyre went to see Dr. Richard Nelson, a neurologist in Billings, Montana, in November, 1988. Dr. Nelson obtained a history of both the 1987 and 1988 injuries and diagnosed cervical, lumbosacral sprain syndrome, a bulging disc and right TOS. Later, in a June 1, 1989 letter to the claimant's attorney, Dr. Nelson stated:

> Since the thoracic outlet syndrome is placed in that same exact anterior cervical spine taht [sic] the fracture took place, it is more likely than not that this was, indeed, the origin of his thoracic outlet syndrome. With regard to his neck syndrome he has osteoarthritic spurring and bulged disc which is causing some thecal indentation in the neck and no one would be able to tell when that occurred, in either the first or the second accident.

In November, 1989, Dr. Martini stated by letter to the claimant's attorney that, due to the trauma involved in the first accident, it was his opinion that the TOS was "most consistent with the mechanism of injury surrounding the first incident." He further recommended that the claimant enroll in the Spinal Rehabilitation Program.

McIntyre entered the Kalispell Regional Hospital Spinal Rehabilitation Program on January 15, 1990. In the admission history, Dr. Martini recorded that McIntyre had suffered a fractured right clavicle in 1987 and had, at the time of that

5

occurrence, experienced "right upper extremity numbness and discomfort."

Trial was held in the Workers' Compensation Court on May 23, 1990. The medical evidence and testimony of Dr. Ivy and Dr. Martini were entered by depositions. The Workers' Compensation Court entered its Findings of Fact and Conclusions of Law and Judgment on October 18, 1990, ruling that the claimant had failed to causally relate the TOS to his 1987 injury by a preponderance of the evidence. The Workers' Compensation Court recognized that it was without jurisdiction to consider the 1988 injury at that time; therefore, it could not establish any disability entitlements.

The first issue is whether the Workers' Compensation Court erred in concluding that the claimant's TOS did not result from his 1987 injury. We note that the question before this Court is not whether a 1987 injury occurred; nor is it whether the claimant's TOS was proved by a preponderance of the medical evidence. The question the claimant presented to the Workers' Compensation Court is whether the <u>1987 injury caused</u> his TOS.

We begin our analysis by considering the question of what standard of review to apply. The claimant argues that this Court should review the Workers' Compensation Court's decision based upon a preponderance of the evidence rather than utilizing the usual substantial credible evidence test. This argument is based on the fact that the medical testimony has been entered into evidence by deposition and we, therefore, sit in as good a position as the

Workers' Compensation Court to judge the weight to be given to such record testimony. The claimant is correct as to the medical evidence on a stand alone basis.

As we have often and consistently stated, the standard of review for decisions of the Workers' Compensation Court is whether substantial credible evidence exists to support the court's decision. Roadarmel v. Acme Concrete Co. (1989), 237 Mont. 163, 772 P.2d 1259; O'Brien v. Central Feeds (1990), 241 Mont. 267, 786 P.2d 1169. Where medical testimony is offered by deposition, however, we have held that this Court sits in as good a position as the Workers' Compensation Court to judge the weight to be given that testimony. Roadarmel at 168, 772 P.2d at 1262. Thus, the claimant is correct that this Court may review and weigh the medical deposition testimony.

This independent review standard does not apply to our review of the entirety of the case before the Workers' Compensation Court and that court's overall decision, however. As we stated in Sciuchetti v. Hurt Construction:

> Claimant points out that because all of the medical testimony in this case was by deposition, this Court is in as good a position as the Workers' Compensation Court to judge the weight to be given that testimony. (Citation omitted.) While that standard of review is correct, this Court will nevertheless uphold the lower court if there is substantial credible evidence to support its conclusion.

Sciuchetti v. Hurt Construction (1989), 238 Mont. 170, 174, 777 P.2d 308, 311. Thus, this Court's review of the medical depositions must be overlaid onto an encompassing review of the Workers' Compensation Court's decision under the substantial

7

credible evidence standard. This result is both obvious and necessary when we consider that other important evidence--in this case, the testimony of both the claimant and his spouse--was before the Workers' Compensation Court as oral testimony; this is particularly important where, as here, the medical histories on which the doctors so heavily relied also were provided by the claimant himself. The Workers' Compensation Court remains in the best position to determine the credibility and weight to be given to live testimony.

In Snyder v. San Francisco Feed and Grain (1987), 230 Mont. 16, 748 P.2d 924, we reviewed the evidence introduced by medical deposition and found "the medical evidence, together with other evidence" was "in stark contrast with" the conclusion of the Workers' Compensation Court. (Emphasis added.) Snyder at 25, 748 P.2d at 929. Lest we create another standard of review to muddy the waters, we note that "stark contrast" in Snyder was merely a creative way of stating that there was not substantial evidence to support the Workers' Compensation Court's decision in that case. It is not this Court's function to determine whether there is sufficient evidence to support contrary findings. O'Brien at 272, 786 P.2d at 1172.

Thus, in reviewing the decision in the case at bar, we will not substitute our judgment for the Workers' Compensation Court if there is substantial credible evidence to support its conclusion that the claimant did not prove the TOS to be causally related to the 1987 injury. We find such evidence in the record.

8

The evidence shows that Dr. Ivy was McIntyre's only treating physician for the 1987 injury. Dr. Ivy testified that McIntyre never complained of TOS symptoms (pain and numbness in the right shoulder, arm and hand) prior to the 1988 injury. Dr. Ivy was also the first medical doctor to examine him after his 1988 injury. Finally, Dr. Ivy stated clearly that he could not relate the TOS to the 1987 injury since the TOS was on the right side and the fractured clavicle was on the left.

Dr. Nelson's opinion, set forth in his June 1, 1989 letter to claimant's attorney, was based on an examination of claimant conducted one and a half years after the 1987 injury and a medical history provided entirely by McIntyre. Furthermore, Dr. Nelson expressed the belief that the 1987 injury was "more likely than not" the origin of his TOS because the TOS "is placed in that same exact anterior cervical spine taht [sic] the fracture took place." McIntyre suffers from right TOS, which is not placed in the "same exact" area as the left clavicle which was fractured in the 1987 accident.

The evidence also shows that Dr. Martini was not aware of the 1987 accident until April, 1989, almost two years after it had occurred and approximately nine months after he diagnosed the right TOS in July, 1988. Dr. Martini admitted that in assigning causation of injuries to the two separate accidents he relied almost entirely on what McIntyre reported to him. And although Dr. Martini correctly indicated in his office notes on April 20, 1989, that McIntyre had fractured his left clavicle in 1987, he

9

incorrectly reported that McIntyre was suffering from <u>right</u> TOS as a result of a fractured <u>right</u> clavicle when admitting him for in-patient spine rehabilitation in January, 1990.

The fact that Dr. Martini relied so heavily on McIntyre's narrations and recountings of the 1987 and 1988 injuries makes it clear why the claimant's oral testimony, although not medical evidence, was an important factor in the Workers' Compensation Court's decision and must result in this Court basing its overall review on the substantial credible evidence test. McIntyre's credibility and the weight to be given to his testimony are judgments to be made by the Workers' Compensation Court; that credibility, as determined by the Workers' Compensation Court, appropriately may carry over into the credibility of the doctors' diagnoses based on the claimant's statements.

The claimant claims to have experienced numbness and pain in the right shoulder and arm prior to the 1988 injury, but admits that he did not report any of these symptoms to any physician until <u>after</u> the <u>1988</u> accident. Indeed, the claimant did not advise either Dr. Martini or Mr. Tracy of the 1987 injury when he saw them regarding the 1988 injury and did not suggest to them at that time that the right shoulder and arm symptoms predated the 1988 injury. In addition, McIntyre claims the 1988 injury did not immediately bother him, while Dr. Ivy testified that McIntyre reported immediate numbness in his right shoulder and arm after the 1988 injury.

The weight to be given to the totality of the testimony and

evidence is a determination to be made by the Workers' Compensation Court, not this Court. As that court concluded:

> [C]laimant's medical history from 1987 to May, 1988 does not include any ongoing problems with his right arm. Indeed, it appears that most, if not all of claimant's complaints regarding the numbness and tingling in the arm originate after the 1988 injury as evidenced in nearly all of the medical records. . . . given the history and complaints recorded by the physicians before any dispute arose in this case, the medical opinion of causation relating thoracic outlet to the fractured clavicle when anatomically the former is on the right and the latter the left, and <u>the fact that claimant did not complain of or seek medical treatment for the thoracic outlet symptoms until after the 1988 injury</u>, we are convinced that he has failed to causally relate the thoracic outlet to the 1987 event. (Emphasis added.)

The claimant argues that Dr. Ivy's testimony lacked the proper foundation necessary for admissible evidence regarding expert opinion. He asserts that the Workers' Compensation Court gave too much weight to Dr. Ivy's testimony regarding TOS causation.

The determination of admissibility of expert testimony rests solely within the discretion of the trial court. Krohmer v. Dahl (1965), 145 Mont. 491, 402 P.2d 979. Furthermore, it is for the trier of fact to give whatever weight it sees fit to expert testimony. Biegalke v. Biegalke (1977), 172 Mont. 311, 564 P.2d 987. The Workers' Compensation Court did not abuse its discretion in considering Dr. Ivy's testimony.

From the foregoing review of the record, we find that substantial credible evidence exists to support the decision of the Workers' Compensation Court.

The second issue is whether McIntyre is entitled to temporary total disability benefits for the three-month period following his

1987 injury.

The Workers' Compensation Court concluded that the claimant was not entitled to temporary total disability benefits. We agree.

Temporary total disability is defined in § 39-71-116(20), MCA, as a condition that "results in total loss of wages." As a result of an arrangement between himself, his wife and his employer, the claimant continued to receive his regular wage during that three-month period. The claimant would have us believe that since it was his wife who performed the work, it was his wife who was paid and not him. The record does not support this contention. While both the claimant and this Court might question the wisdom of the arrangement entered into by him, the wages were nonetheless paid to McIntyre.

It is unnecessary to address the remaining two issues the claimant raises since he has failed to relate his current disability to the 1987 injury and since there has been no award of benefits as a result of his appeal.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

R.C. McDonough
                    Justices

Justice Terry N. Trieweiler dissenting.

I respectfully dissent from the opinion of the majority.

In this case, the defendant conceded in the pretrial order that the claimant had been injured during the course of his employment on May 9, 1987. The dispute related to the extent of injury and whether or not the claimant sustained any permanent disability as a result of that injury. The issue, as framed in the final pretrial order signed by both parties, was as follows:

> 1. What is the nature and extent of the claimant's permanent disability arising from his injuries of May 9, 1987, and what are the benefits to which the claimant is entitled?

According to the workers' compensation statute in effect at the time of the claimant's injury, disability must be proven by a preponderance of medical evidence. Section 39-71-116(12), (13), and (19), MCA (1985). Therefore, the trial court's decision had to be based upon the preponderance of the medical evidence.

In this case, all of the medical evidence was by deposition or written document. There was no medical evidence provided by any live witness.

The traditional reason for deferring to trial judges and juries in the resolution of factual disputes is that they are in a better position to observe the demeanor of witnesses and observe physical evidence where it is relevant. However, we have frequently recognized that that traditional notion of deference makes no logical sense in a case where the Workers' Compensation

14

Court's decision is based upon the same medical documents or depositions that are before us in this Court. We have repeatedly held that in that situation we are in as good a position to evaluate the medical testimony as the trial judge. Brown v. State Compensation Ins. Fund, 231 Mont. 158, 752 P.2d 171 (1988); Shupert v. Anaconda Aluminum Co., 215 Mont. 182, 188, 696 P.2d 436, 439 (1985); Hert v. J.J. Newberry Co., 178 Mont. 355, 360, 584 P.2d 656, 659 (1978).

In this case, any objective analysis of the medical evidence can lead to only one conclusion--that the claimant's thoracic outlet syndrome was caused by the crush injury that he sustained on May 9, 1987.

Of the two medical witnesses whose testimony was offered by deposition, one testified that he was not in a position to express an opinion, and the other expressed an unqualified opinion in favor of the claimant. The only other opinion expressed was in the medical report of Richard A. Nelson, M.D. It was also his opinion that the claimant's T.O.S. was caused on May 9, 1987.

Even if this Court had no independent obligation to review that medical evidence (which is not the case), and chose simply to defer to the trial judge, there was no medical evidence of any type to support the trial judge's finding that the claimant was not injured on May 9, 1987.

In support of its decision, the majority opinion states that Dr. Ivy could not relate the T.O.S. to the 1987 injury, and implies

15

that he had a reason for believing otherwise. However, what Dr. Ivy actually said was that he had no opinion because he had never examined nor treated the claimant for that condition. His actual testimony was as follows:

> So what I am telling you, I can't render an opinion regarding his thoracic outlet syndrome because I haven't examined him for it. And the only pain he had down his arm that I know about is the pain that he had on 5/23, which was a pinched nerve as far as I'm concerned. It had nothing to do with thoracic outlet syndrome.

Dr. Ivy's inability to express any opinion regarding causation hardly rises to the level of substantial medical evidence in support of the trial court's finding.

Dr. Ivy admitted that he was not qualified to express an opinion regarding the cause of the claimant's thoracic outlet syndrome because he had not treated him for that condition. Dr. Ivy's testimony was properly objected to and should not have formed the basis for the Workers' Compensation Court's decision.

On the other hand, Steven M. Martini, M.D., who diagnosed and has treated the claimant for his thoracic outlet syndrome, expressed a very unequivocal opinion regarding its causation. He explained that T.O.S. results when the nerves and major vessels, which pass between the first rib and the clavicle (in the area of the sternum or chest), sustain a compression or irritation from injury. He also testified:

> The first injury, which was well documented as a crush injury to the chest, to a high degree of medical certainty, would have caused his thoracic outlet syndrome.

16

It's consistent historically with what we know about thoracic outlet syndrome, i.e. local trauma to the area of the brachial plexus. And the medical record and the patient's account would reflect that was the case.

The majority attempts to minimize the impact of Dr. Martini's uncontroverted medical opinion by pointing out that in one of his medical entries he referred to a fracture of the right clavicle, rather than correctly referring to the left clavicle. However, that discrepancy is totally irrelevant. The clavicles are separated by no more than a couple of inches. The claimant's earliest report of injury to his employer following the May 9, 1987, incident, clearly indicates that the trauma was to his chest area, and that he sustained contusions over that entire area.

Dr. Richard A. Nelson's opinion was also admitted into evidence, not, as the majority has suggested, because of the Workers' Compensation Court's liberal consideration of the medical evidence, but because there was no objection to it by the defendant. Dr. Nelson also clearly stated an uncontested opinion that the claimant's thoracic outlet syndrome resulted from the crush injury on May 9, 1987.

[I]t seems from reviewing my records and the information you provided here regarding your question of which of his injuries is more likely to have caused the problem with thoracic outlet syndrome, that would certainly have been the 5/9/87, injury because it was of such a high magnitude in fracturing the clavicle at the same time. Since the thoracic outlet syndrome is placed in that same exact anterior cervical spine that the fracture took place, it is more likely than not that this was, indeed, the origin of his thoracic outlet syndrome.

17

The majority dismisses Dr. Nelson's opinion, based on its misunderstanding of anatomy. The majority concludes that because the T.O.S. was on the right and the fractured clavicle on the left, Dr. Nelson was mistaken in his conclusion that both injuries occurred in the same place. However, Dr. Nelson's reference to anterior cervical spine does not refer to right or left, it merely refers to the front part of the body, rather than the posterior or back side.

The majority opinion also fails to point out that in Dr. Nelson's November 9, 1988, evaluation, which was attached to Dr. Martini's deposition without objection, Dr. Nelson clearly pointed out, when referring to the claimant's history that:

> [H]e was jacking up a trailer for a tire flat and the jack slipped and the tire came down and hit him in the left shoulder, anterior cervical chest region causing a fracture of the <u>left</u> collarbone and subsequent to this he developed headaches about two days later and had a cast put in place and he continued to live with this pain with a stiff neck . . . .

(Emphasis added.)

It is clear that Dr. Nelson was aware that the claimant's fractured clavicle was on the left side.

The majority incorrectly concludes that the Workers' Compensation Court was free to disregard all of the uncontroverted medical testimony because of other "substantial" evidence which the court had before it. On the one hand, the majority agrees that where medical evidence is by deposition or document, this Court is in as good a position as the trial court to evaluate that

18

testimony. However, in the next breath the majority emasculates that standard of review by finding that:

> The medical depositions must be overlaid onto an encompassing review of the Workers' Compensation Court's decision under the substantial credible evidence standard.

I suppose the only way to reconcile these two apparently conflicting standards of review is to say that where this Court wants to reverse the Workers' Compensation Court it will review the medical deposition testimony independently, and where it wants to affirm the Workers' Compensation Court, without being accountable for the decision, it will overlay the medical depositions with the rest of the testimony. However, in this case, the rest of the testimony provides no support for the trial court's decision.

The only people who testified at trial were the claimant and his wife. Neither of them were impeached nor contradicted in any significant aspect of their testimony, and nothing in their testimony provided any basis for the trial court's conclusion that the claimant was not disabled from his May 9, 1987, injury. Furthermore, the Workers' Compensation Court's conclusion was not based upon any reservation that it had about the claimant's or his wife's credibility. It was based upon that court's misunderstanding of the physical evidence.

The trial court concluded that because the claimant fractured his left clavicle, and his thoracic outlet symptoms were on the right side, they could not have both resulted from the same

19

accident. However, the evidence is to the contrary. Dr. Ivy testified that when he saw the claimant one-half hour after the May 9, 1987, accident, he was told that a trailer fell on the claimant's chest. The claimant described the trailer as a steel lowboy with three axles which weighed approximately 2000 pounds. Dr. Ivy also testified, and his records indicate, that in addition to the fractured left clavicle, the claimant sustained contusions to his chest.

Dr. Martini explained that thoracic outlet syndrome results when the nerves and major vessels, as they pass between the first rib and the clavicle, sustain a compression or irritation from injury. Those nerves and vessels, which would account for symptoms on the claimant's right side, are within inches of the fracture that occurred to his left clavicle. It is extremely doubtful that the 2000 pound trailer which crushed the claimant's chest was capable of such discrete damage that it could have injured his left clavicle without causing any damage several inches further to the right on his chest.

In short, whether we apply the appropriate standard of review, which is whether the claimant had proven his claim by a preponderance of the evidence, or if we simply review the record to determine whether there was substantial evidence to support the Workers' Compensation Court's finding that the claimant was not disabled, this case should be reversed.

I also dissent from the majority's second opinion which concludes that the claimant was not entitled to temporary total disability benefits for the three month period following his 1987 injury.

It was uncontradicted that the claimant was placed in a cast for his clavicle fracture two days after his injury, and that he was unable to do the heavy physical labor involved in maintaining ditches for the irrigation district by which he was employed.

It was the secretary for the claimant's employer who requested that the claimant's wife perform his job so that they could continue to pay him, instead of providing disability benefits. The claimant had no prior experience with workers' compensation claims.

Following his injury, he did not return to work, at all, for three weeks. After that time, he simply rode in a truck to give instructions to his wife. All of the work which he had previously performed as part of his job was performed by his wife. Any payment made by his employer was payment for his wife's services. To hold that the employer can avoid paying disability benefits, during a period that the claimant was obviously unable to work because of a work related injury, by putting his name on the check that belonged to his wife, is to exalt form over substance and encourage future mischief by employers and insurers.

If the claimant had not been married, or if his wife had been otherwise employed and unavailable to perform his duties, his employer would have had to hire a third person and pay that person

21

directly. Certainly, under those circumstances, the defendant would not claim, and this Court would not find, that the insurer could avoid its obligation to pay total disability benefits during the three months that the claimant was unable to return to work. Allowing the defendant to avoid those same obligations under the circumstances in this case, gives this Court's blessing to a subterfuge and sham.

The claimant's wife was a separate person and entitled to be treated that way, rather than as an appendage of her husband, for purposes of compensation for her work.

For these reasons, I would reverse the decision of the Workers' Compensation Court and remand for a determination of the claimant's disability rate, the extent of his permanent partial disability, and whether he is entitled to have any or all of his disability benefits converted to a lump sum.

_____
Justice

We concur with the foregoing dissent of Justice Trieweiler.

_____

_____
Justices