No. 95-439

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

CARL LARSON,

      Petitioner and Appellant,

  v.

CIGNA INSURANCE COMPANY
Insurer and Respondent for YELLOWSTONE
FORD AND TRUCK SALES,

      Respondents and Respondents.

**FILED**

APR 23 1996

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   Workers' Compensation Court
              The Honorable Mike McCarter, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

          James G. Edmiston, III, Billings, Montana

      For Respondent:

          Sara Sexe, Great Falls, Montana


Submitted on Briefs:  February 8, 1996

Decided:  April 23, 1996

Filed:

_____
         Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

Carl Larson appeals the September 1995 judgment of the Workers' Compensation Court denying his claim for permanent total disability benefits for his work related hernia condition.

We reverse and remand.

On appeal, Larson raises several issues which we have consolidated and restate as follows:

1. Did substantial evidence exist to support the Workers' Compensation Court's finding that Larson had a reasonable prospect for employment within his normal labor market, thus precluding him from receiving permanent total disability benefits?

2. Did the Workers' Compensation Court err in not applying Brurud v. Judge Moving & Storage (1977), 172 Mont. 249, 563 P.2d 558?

3. Did the Workers' Compensation Court err by not requiring the insurer to comply with the "Coles" criteria as set forth in Wood v. Consolidated Freightways (1991), 248 Mont 26, 808 P.2d 502?

STATEMENT OF THE FACTS

Appellant, Carl Larson, was a parts manager for Yellowstone Ford Truck Sales in Billings, Montana, and had been working in the truck-parts business for thirty years prior to 1981. On August 22, 1980, Larson suffered a non-work related heart attack and did not work for several months. Following a series of operations, he returned to work full time in the spring of 1981. In addition to this heart condition, Larson had several other significant health

problems including degenerative disc disease and a frozen left shoulder. In 1977, Larson underwent surgery to have portions of his stomach removed due to peptic ulcer disease. Following this surgery he suffered an incisional hernia.

In July 1981, following his return to work after his heart attack, Larson suffered a left inguinal hernia after lifting a heavy truck spring. CIGNA, the insurer for Yellowstone Ford, accepted liability for the injury and paid both medical benefits and temporary total disability benefits. Larson had surgery to repair the hernia in September 1981, and returned to work on October 5, 1981. On October 23, 1981, Larson's treating physician, Dr. Kobold, noted that he considered Larson's inguinal hernia "one hundred percent healed." In December of the same year, Larson was laid off because of his inability to perform his job. Yellowstone Ford's general manager said Larson's physical condition made him unable to carry out his assigned duties.

In January 1982, Larson underwent heart surgery to replace a mitral valve. In his deposition, Larson testified that he had planned on working until he was 65, but following his lay off he did not seek employment.

In May 1982, Larson complained to Dr. Kobold of pain in his groin region. Dr. Kobold thought the pain may be related to Larson's back condition, and referred him to an orthopedic surgeon, Dr. Daniels. After examining Larson, Dr. Daniels wrote Dr. Kobold informing him that he did not think that Larson's pain was a result of a nerve-root problem. In June 1982, an associate of Dr. Kobold,

Dr. McGahan, found a recurrence of the inguinal hernia symptoms and scheduled a follow-up appointment. However, Larson did not return for further treatment until December 1984.

Beginning in 1982, various medical reports and testimony indicate that Larson continued to suffer pain in the groin region. The inguinal hernia was surgically re-repaired in early 1985, again in 1986, and a fourth time in 1987. The medical bills for these subsequent hernia repairs were all paid by CIGNA. In September of 1992, Larson submitted a claim for additional compensation benefits for the hernia.

## STATEMENT OF THE CASE

In October 1994, the Workers' Compensation Court denied Larson's claim for benefits concluding that Larson's non-work related heart condition preceded the industrial injury. Because he had been rendered permanently totally disabled prior to suffering the industrial injury, the Workers' Compensation Court determined he was not entitled to recover permanent total disability benefits. Claimant appealed that decision.

In May 1995, this Court reversed the Workers' Compensation Court's decision. Larson v. CIGNA Insurance Co. (1995), 271 Mont. 98, 894 P.2d 327 (Larson I). In Larson I, this Court adopted the rationale set forth in a Washington case and later used in an Alaskan decision. See Shea v. Department of Labor and Industries (Wash. Ct. App. 1974), 529 P.2d 1131; Ensley v. Anglo Alaska Construction (Alaska 1989), 773 P.2d 955. In Shea, the claimant had been rendered disabled as a result of a degenerative vascular

disease as early as 1961. Then, in 1964, the claimant had suffered a permanently disabling industrial injury. The Washington Court concluded that although other circumstances may have rendered the claimant disabled, he was not precluded from receiving benefits as a result of his second permanently disabling injury. Shea, 529 P.2d at 1134.

We remanded Larson I for proceedings consistent with that opinion and asked for specific findings and conclusions "as to whether Larson's subsequent, inguinal hernia constituted an independent, totally disabling work related condition." Larson I, 894 P.2d at 330-31. In September 1995, the Workers' Compensation Court reconsidered the case and again found that Larson was not entitled to permanent total disability benefits. Again, Larson appeals.

STANDARD OF REVIEW

The Workers' Compensation Court's findings of fact are presumed to be correct and will be affirmed if supported by substantial evidence. Wunderlich v. Lumbermens Mut. Cas. Co. (1995), 270 Mont. 404, 408, 892 P.2d 563, 566; Sullivan v. Aetna Life & Cas. (1995), 271 Mont. 12, 15, 894 P.2d 278, 280.

The statutes in effect on the date of injury must be applied when determining benefits. Buckman v. Montana Deaconess Hosp. (1986), 224 Mont. 318, 321, 730 P.2d 380, 382. Larson suffered an industrial injury on July 15, 1981. Therefore, the workers' compensation laws of 1979 apply. Under these laws, workers' compensation claims were to be liberally construed in favor of the

5

injured worker.   Section 39-71-104, MCA (1979); Stokes v. Delaney & sons, Inc. (1964), 143 Mont. 516, 519-20, 391 P.2d 698, 700.

ISSUE ONE

Did substantial evidence exist to support the Workers' Compensation Court's finding that Larson had a reasonable prospect for employment within his normal labor market, thus precluding him from receiving permanent total disability benefits?

Larson filed for workers' compensation benefits in 1992, claiming the work related injury he had suffered in 1981 left him permanently disabled.  In both its original 1994 judgment and again in 1995, the Workers' Compensation Court decided Larson was not entitled to permanent total disability benefits.

The claimant bears the burden of establishing a right to compensation. DuMont v. Wickens Bros. Constr. Co.(1979), 183 Mont. 190, 201, 598 P.2d 1099, 1105.  In this case, Larson had the burden of establishing that he was permanently totally disabled within the definition of the statute that reads as follows:

> "Permanent total disability" means a condition resulting from injury as defined in this chapter that results in the loss of actual earnings or earning capability that exists after the injured worker is as far restored as the permanent character of the injuries will permit and which results in the worker having no reasonable prospect of finding regular employment of any kind in the normal labor market.

Section 39-71-116(13), MCA (1979).

This definition contains both medical and non-medical components. Wood v. Consolidated Freightways (1991), 248 Mont. 26, 29, 808 P.2d 502, 504.  The non-medical component of the definition

6

requires that a claimant establish "no reasonable prospect for employment in the normal labor market." Section 39-71-116(13), MCA (1979). In order to establish that the claimant had no reasonable prospect of employment in a normal labor market he must introduce substantial credible evidence of (1) what jobs constitute his or her normal labor market, and (2) a complete inability to perform the employment and duties because of his or her work related injury. Metzger v. Chemetron Corp. (1984), 212 Mont. 351, 355, 687 P.2d 1033, 1035. Once the claimant has presented evidence affirmatively showing that he cannot return to work in his normal labor market, the burden of proof shifts to the employer to show that suitable work is available. Metzger, 687 P.2d at 1036.

Here, the Workers' Compensation Court's 1995 judgment acknowledges the Metzger test. In doing so, the court rejected Larson's argument that he was an "odd-lot" employee. An "odd-lot" employee is an individual who has suffered total disability to the extent of being unemployable in the labor market. As an odd-lot employee, a claimant is excused from introducing affirmative evidence in satisfaction of the Metzger test, thus shifting the burden to the employer to show suitable employment. See 2 Arthur Larson, Workers' Compensation Law Desk Ed., § 57.51 at 10-54, 55; Brurud v. Judge Moving & Storage (1977), 172 Mont. 249, 563 P.2d 558.

Having rejected Larson's odd-lot argument, the Workers' Compensation Court did not make a finding as to whether Larson carried his burden to show no reasonable prospect of employment

7

under the Metzger test.  Instead, the court found that Larson had presented a prima facie case for permanent total disability, not for his work related hernia condition but, for his non-work related heart condition.  The court then found that even if Larson was an odd-lot claimant, CIGNA had established that he was employable despite his industrial accident.

After considering Larson's work history, in combination with his work related injury, superimposed upon a myriad of pre-existing conditions, we disagree.  Substantial credible evidence does not support a finding that Larson had a reasonable prospect for employment following his 1981 injury pursuant to § 39-71-116 (13), MCA (1979).

In this case, two rehabilitation counselors and two physicians offered testimony on Larson's prospect of finding regular employment in his normal labor market.  Only one of them, Ms. Hooper, a rehabilitation counselor, testified at trial.  Both physicians testified by deposition.  To the extent a decision is based on medical reports and depositions, this Court sits in as good a position as the Workers' Compensation Court and we review the evidence de novo.  White v. Ford, Bacon & Davis Texas, Inc. (1992), 256 Mont. 9, 13, 843 P.2d 787, 789; McIntyre v. Glen Lake Irrigation Dist. (1991), 249 Mont. 63, 67, 813 P.2d 451, 454.

Initially, there is no question that Larson could not return to a position in the auto-parts industry.  Dr. Kobold, Larson's treating physician, testified that from 1982 on, he would not have allowed Larson to work in any position requiring heavy lifting.

8

The Workers' Compensation Court found that Larson's inguinal hernia precluded him from returning to any sort of job in this field.

Outside of heavy labor positions, the court adopted Ms. Hooper's analysis of what constituted Larson's "residual labor market." Ms. Hooper testified that Larson had numerous skills that could be transferred to sedentary or light duty positions. At trial, she testified that Larson could have found a position in sales, specifically in a retail setting such as a hardware store or in real estate or insurance telemarketing. Ms. Hooper also discussed Larson's avocation as a woodworker. She indicated that there were a few woodworking jobs that fell within Larson's physical restrictions.

Even with Larson's transferable skills, however, Ms. Hooper acknowledged that Larson faced significant barriers due to his "light duty" restrictions, in addition to his age (58 yrs). Ms. Hooper testified that without the appropriate assistance, she thought that it would be "real difficult" for Larson to go out and seek employment after going through a medical process that focused on the things that Larson could not do. Ms. Hooper then testified that overcoming this difficulty would necessitate the use of rehabilitative services. Larson did not receive rehabilitative services. Instead, Larson considered himself to be retired following his lay off.

A review of Larson's work history reveals no telemarketing experience. Ms. Hooper also explained that the majority of the woodworking positions were classified as heavy labor, and that

9

finding an appropriate position would require substantial research and employer contacts. As for the sales positions, Ms. Hooper admitted that she had not done any job analyses or research to determine the availability of these types of jobs. At trial, she stated that she had not identified any "specific" jobs which would have been available to Larson after his lay off.

Ms. Gordon, the other rehabilitative counselor, testified only by deposition. In her report, she identified occupations for which Larson was vocationally qualified, and which were also supported by labor-market data. It was Ms. Gordon's opinion that Larson had lost 100% of the jobs in his normal labor market.

In reaching her conclusion, Ms. Gordon prepared several job analyses using Larson's 1993 physical capabilities. These job analyses were then used by counsel for both parties when deposing the testifying physicians. Dr. Kobold approved of only one job analysis, that of general salesperson in a hardware store. The Workers' Compensation Court referred to this approval in its findings of fact.

One of the physical demands of this position, however, was the ability to lift 26 to 50 pounds. This amount exceeds the physical restrictions placed on Larson by both doctors. When this was pointed out to Dr. Kobold, he qualified his approval and stated that he would still restrict Larson to a 30 pound lifting maximum. The other physician who reviewed Ms. Gordon's job analyses did not approve of any of the positions, including the general salesperson position.

10

Factually, we consider this case to be similar to Brewington v. Birkenbuel (1986), 222 Mont. 505, 723 P.2d 938. In that case, the claimant was around the same age as Larson and had also worked in heavy labor his entire life. Also like Larson, the claimant in Brewington did not receive any rehabilitative services. The Workers' Compensation Court determined that the claimant could have secured a position as a foremen. We concluded, after considering the medical evidence as well as the claimant's lifetime work history, that the foreman position was not within the claimant's abilities. We held that the evidence supported the conclusion that the claimant was rendered permanently totally disabled by his industrial accident. Brewington, 723 P.2d at 941.

In the present case, the court's findings fail to mention Larson's additional health problems outside of his heart condition and inguinal hernia. As mentioned above, before suffering the hernia, Larson was diagnosed with degenerative disc disease and a frozen left shoulder. Larson also suffered from an unrelated incisional hernia resulting from surgery to have portions of his stomach removed due to peptic ulcer disease.

In the depositions, witnesses were asked to restrict their opinions to a consideration of the inguinal hernia condition, or in the alternative, a consideration of the heart condition and the hernia. Larson's heart condition was specifically factored out upon remand in Larson I but, as we have previously stated, the employer takes his employee subject to the employee's physical condition at the **time** of employment. Bond v. St. Regis Paper Co.

11

(1977), 174 Mont. 417, 420, 571 P.2d 372, 374. It is clear from the evidence that Larson suffered from several physical impairments besides the hernia and the heart condition.

In addition, the medical depositions and records reveal that Larson had a history of pain since 1982. Dr. Kobold testified that he recalled Larson suffered from an "inordinate amount of pain." Dr. Kobold referred Larson to Dr. Daniels, an orthopedic surgeon, to determine if Larson's pain was in his back and therefore amenable to a nerve block. Dr. Daniels determined the pain was not related to a nerve-root problem. Dr. Daniels also noted that Larson had an abdominal bulge, which is indicative of a hernia. In June 1982, the first recurrence of the inguinal hernia was diagnosed.

Subsequently, Larson entered a pattern of repair and recovery for his inguinal hernia. He underwent surgery in 1985, 1986 and for a fourth time in 1987. Dr. Kobold stated it would appear that the hernia never healed correctly. In 1988, Larson received a TENS unit (a pain management device). CIGNA paid for this device and the related supplies. CIGNA also paid for all of Larson's subsequent surgeries, acknowledging that the surgeries were all related to the original industrial injury in 1981.

The Workers' Compensation Court was unpersuaded that this pain would have deterred him from finding employment. However, in past cases, this Court has considered a substantial degree of continuing pain resulting from an injury when determining permanent total disability. See Robins v. Anaconda Aluminum Co. (1978), 175 Mont.

12

514, 521, 575 P.2d 67, 71; Cleveland v. Cyprus Indus. Minerals (1981), 196 Mont. 15, 19, 636 P.2d 1386, 1388. We have also held that a claimant's ability to perform a few odd jobs for a short period of time does not preclude a finding of permanent total disability. Jenson v. Zook Bros. Construction Co. (1978), 178 Mont. 59, 62-63, 582 P.2d 1191, 1193.

In summary, the record offers only qualified approval of the general salesperson position by only one of the testifying physicians. There were no job analyses for any of the other mentioned positions, and the record lacks discussion of Larson's ability to perform at these positions without the aid of rehabilitative services. At the **time** of the injury, Larson was a 58 year old man, with a lifetime of experience in heavy labor, and with multiple health problems.

We hold that the Workers' Compensation Court lacked the substantial evidence necessary to conclude Larson had a reasonable prospect for employment. For this reason, we reverse the Workers' Compensation Court.

## ISSUE 2

Did the Workers' Compensation Court err in not applying Brurud v. Judge Moving & Storage (1977), 172 Mont. 249, 563 P.2d 558?

Prior to adopting the Metzger test, this Court decided Brurud, 563 P.2d 558. In Brurud, this Court determined that whereas the claimant must show there is no reasonable prospect of employment, this does not translate into the burden of showing a reasonable effort to secure employment. Brurud, 563 P.2d at 560.

13

In Brurud, the claimant was 58 years old at the time of injury. With a high school education, he had worked his entire adult life doing heavy labor. In concluding that the claimant was permanently disabled for the purpose of receiving benefits, the Division (now the Department of Labor and Industry) found no reasonable prospect of the claimant finding regular employment in the labor market. We affirmed the Workers' Compensation Court in that case, agreeing that in some situations it would be futile for an employee to make a concerted effort to secure employment.

However, this case is not the same as Brurud. CIGNA has never contested that Larson had made a reasonable effort to find employment. Instead, CIGNA attempted to prove Larson's "reasonable prospect for employment" in the normal labor market.

We hold that the Workers' Compensation Court did not err by not applying Brurud in its analysis of this case.

ISSUE 3

Did the Workers' Compensation Court err by not requiring the insurer to comply with the "Coles" criteria as set forth in Wood v. Consolidated Freightways (1991), 248 Mont 26, 808 P.2d 502?

The "Coles" criteria originated in a 1984 Workers' Compensation Court opinion. Coles v. Seven-Eleven Stores (1985), 217 Mont. 343, 704 P.2d 1048. In Coles the insurer had converted a claimant's benefits from temporary total to permanent partial benefits. At that time, the Workers' Compensation Court found that insurers are statutorily obligated to determine the "nature and extent of an injured worker's disability" before such a conversion

14

of a claimant's benefits. See Lindquist v. Sletten Construction Co, decided January 12, 1984, W.C. Docket No. 1851. The court then concluded that an insurer's failure to investigate prior to conversion warranted the imposition of a penalty. By way of anticipation, the Workers' Compensation Court then listed the **"minimum** information" necessary to discharge the insurer's duty of investigation as:

> (1) a physician's determination that the claimant is as far restored as the permanent character of his injuries will permit;
>
> (2) a physician's determination of the claimant's physical restrictions resulting from an industrial accident;
>
> (3) a physician's determination, based on his [or her] knowledge of the claimant's former employment duties, that he can return to work, with or without restrictions, on the job on which he was injured or another job for which he is fitted by, age, education, work experience, and physical condition;
>
> (4) notice to the claimant of receipt of the report attached to a copy of the report.

This list became the Coles criteria. Coles, 704 P.2d 1048.

Claimant argues that the Workers' Compensation Court erred in not requiring CIGNA to comply with the Coles criteria. He contends compliance is required under Wood, 808 P.2d 502. In Wood, an injured claimant was receiving temporary total disability payments when the insurer terminated these benefits with a letter in 1988. This letter did not include any medical or vocational reports. The Workers' Compensation Court used the Coles criteria to examine whether the insurer had met the minimum burden necessary to

15

discharge the duty to investigate the nature and extent of the claimant's injuries.

The facts here are different, however. Larson returned to work. When a claimant returns to work, he or she is no longer experiencing a loss in wages and, **therefore, the insurer can** rightfully terminate temporary total disability benefits without proceeding with an investigation under § 39-71-609, MCA (1979), which reads as follows:

> Denial **of claim after payments made or termination of benefits by insurer. . .** If an insurer determines to deny a claim on which payments have been made. . .during a time of further investigation or, after a claim has been accepted,. it may do so only after 14 days written notice to the claimant. . . However, if an insurer **has knowledge that the claimant has returned to work, compensation benefits may be terminated as of the time the claimant returned to work.**

Since the duty of investigation was statutorily discharged, the <u>Coles</u> criteria do not apply in this case.

We hold that the Workers' Compensation Court did not err by not applying the <u>Coles</u> criteria to determine the insurer's burden of proof in **Larson's** claim for permanent total disability benefits.

Reversed and remanded with instructions to enter judgment in favor of the claimant and for any further proceedings necessary in accordance with this opinion.

_____
Justice

We Concur:


_____
Chief Justice

16

_____

_____

_____
Justices

Justice Karla M. Gray, concurring and dissenting.


I concur in the Court's opinion on issues two and three and respectfully dissent from that opinion on issue one, which is whether substantial credible evidence supports the Workers' Compensation Court's finding that Larson had a reasonable prospect for employment within his normal labor market, thus precluding him from receiving permanent total disability benefits. The Court's conclusion that substantial evidence does not support the finding marks the second time in one month that this Court has mouthed the correct standard of review regarding findings by the Workers' Compensation Court and then proceeded to substitute its judgment for that of the trier of fact with regard to weighing the evidence and determining the credibility of the witnesses. See South v. Transportation Insurance Co. (Mont. 1996), 913 P.2d 233, 53 St.Rep. 196. I cannot join in this course of action which demeans the careful work and proper role of the Workers' Compensation Court in order to achieve the result this Court prefers.

Our standards of review are clear and, at least in principle, unwavering. In reviewing findings of the Workers' Compensation Court, we determine whether those findings are supported by substantial credible evidence. Wilson v. Liberty Mut. Fire Ins. (Mont. 1995), 903 P.2d 785, 787, 52 St.Rep. 990, 991 (citation omitted). Substantial evidence is more than a mere scintilla of evidence, but it may be less than a preponderance of the evidence. Wilson, 903 P.2d at 787 (citation omitted). We will not substitute

18

our judgment for that of the trier of fact where the issue relates to the weight given to certain evidence or the credibility of the witnesses. Wilson, 903 P.2d at 787 (citations omitted). Our standard is not whether the evidence supports findings different from those made by the Workers' Compensation Court. Wilson, 903 P.2d at 788 (citations omitted).

Notwithstanding these clear standards, and the Court's enunciation of them, even a casual reading of the record in this case--including the Workers' Compensation Court's findings--establishes that this Court has merely located evidence which supports findings contrary to those it is reviewing, reweighed all the evidence and reached the result it desires. I cannot agree.

This Court concludes that substantial credible evidence does not support a finding that Larson had a reasonable prospect for employment following his 1981 hernia injury. That conclusion is incorrect. The Workers' Compensation Court relied in part on Dr. Kobold's testimony. Dr. Kobold specifically testified that, as of 1982, he would have approved Larson working at a general salesperson position with a maximum 20-pound lifting requirement.

The Workers' Compensation Court also relied extensively on Juanita Hooper's testimony, which it specifically found to be persuasive and, thus, credible. Ms. Hooper testified that Larson has transferable skills with which he is qualified to perform general retail sales and telemarketing jobs which involve minimal lifting and which are commonly available in the normal job market. She further testified that, with job placement assistance, Larson

19

has had a _reasonable_ prospect for employment since 1982 and, with rehabilitation support services, he has had at least an "average" prospect of employment since that time. Thus, contrary to this Court's opinion, the record is clear that far more than "substantial" credible evidence supports the Workers' Compensation Court's finding that Larson had a reasonable prospect of employment following his 1981 hernia injury.

Nor do I agree with the Court's statement that the Workers' Compensation Court did not determine whether Larson carried his burden under the Metzger test. The court observed that Larson based his odd-lot employee argument on his heart condition and that it was necessary to factor that condition out of the disability determination to be made in this case. The court then observed that, in any event, the odd-lot doctrine did not add anything to Larson's case "since, through testimony of his vocational counselor (JoAnn Gordon) and other evidence, he presented a prima facie case for permanent total disability." It is my view that this clearly constitutes a determination that Larson carried his burden under Metzger regarding his hernia condition; indeed, Ms. Gordon testified specifically that her conclusions were based solely on Larson's hernia condition. The Workers' Compensation Court then properly addressed the employer's Metzger burden, determining that "Cigna has satisfied its burden of proof both by producing evidence and by persuading me that claimant was employable despite his industrial accident. Juanita Hooper's and Dr. Kobold's testimony are persuasive concerning claimant's ability to work in spite of

20

his hernia."

This Court concedes that "two rehabilitation counselors and two physicians offered testimony on Larson's prospect of finding regular employment in his normal labor market." As set forth above, the Workers' Compensation Court was persuaded by the testimony of Ms. Hooper, one of the rehabilitation counselors, and Dr. Kobold, one of the physicians, that Larson had a reasonable prospect of securing employment in the positions identified by Ms. Hooper and within the limitations placed by Dr. Kobold. Given such a record, this Court's determination that substantial credible evidence does not support the Workers' Compensation Court's finding about Larson's reasonable prospects for employment can be explained only by reference to the fact that it changes the result in this case.

Finally, this Court makes several references to the fact that Larson did not receive the rehabilitation services Ms. Hooper testified would significantly increase his prospects for employment. The reason Larson did not receive the services is that he did not seek them. Even this Court observes in passing that Larson did not seek employment after being laid off in December of 1981--he "considered himself to be retired." Yet, somehow, the Court places the "blame" for Larson's perception of himself as in retirement, and his failure to seek either employment or rehabilitative or job placement services, on the employer.

Substantial credible evidence supports the Workers' Compensation Court's finding that Larson had a reasonable prospect

21

for employment and its conclusion, on that basis, that he is not entitled to permanent total disability benefits. I would affirm the Workers' Compensation Court.

_____
Justice

    Chief Justice J. A. Turnage and Justice Charles E. Erdmann, join in the foregoing concurring and dissenting opinion of Justice Karla M. Gray.

_____
Chief Justice

_____
Justice