JUSTICE TRIEWEILER
specially concurring.
I concur with the majority opinion. However, I write in response to the dissent.
In my opinion it is the dissent which misapplies the standard of review in this case and the author of that opinion who has refused to follow the correct standard of review in the past.
In this case, the only medical evidence was the written reports, which were admitted as exhibits without objection, and the transcribed deposition testimony of Richard C. Dewey, M.D. We have repeatedly held, for obvious reasons, that where medical evidence is submitted by deposition, this Court is in as good a position to evaluate that evidence as the trial court. Larson v. CIGNA Ins. Co. (1996), [276 Mont. 283], 915 P.2d 863; Weber v. Public Employees’ Retirement Bd. (1995), 270 Mont. 239, 890 P.2d 1296; Simons v. State Comp. Mut. Ins. Fund (1993), 262 Mont. 438, 865 P.2d 1118; White v. Ford, Bacon & Davis Texas, Inc. (1992), 256 Mont. 9, 843 P.2d 787; Schrapps v. Safeway Stores (1989), 238 Mont. 355, 777 P.2d 887; Roadarmel v. Acme Concrete Co. (1989), 237 Mont. 163, 772 P.2d 1259; Hartman v. Staley Continental (1989), 236 Mont. 141, 768 P.2d 1380; Hurley v. Dupuis (1988), 233 Mont. 242, 759 P.2d 996; Brown v. Ament (1988), 231 Mont. 158, 752 P.2d 171; Snyder v. San Francisco Feed & Grain (1988), 230 Mont. 16, 748 P.2d 924; Lauderdale v. Montana Dep’t of *97 Agric. (1987), 229 Mont. 188, 745 P.2d 690. Larson v. Squire Shops, Inc. (1987), 228 Mont. 377, 742 P.2d 1003; Currey v. 10 Minute Lube (1987), 226 Mont. 445, 736 P.2d 113; Brewington v. Birkenbuel, Inc. (1986), 222 Mont. 505, 723 P.2d 938; Frost v. Anaconda Co. (1985), 216 Mont. 387, 701 P.2d 987. Shupert v. Anaconda Aluminum Co. (1985), 215 Mont. 182, 696 P.2d 436; Lamb v. Missoula Imports, Inc. (1984), 211 Mont. 360, 684 P.2d 498; Jones v. St. Regis Paper Co. (1981), 196 Mont. 138, 639 P.2d 1140; Hert v. J.J. Newberry Co. (1978), 178 Mont. 355, 584 P.2d 656.
Our oft-repeated rule regarding medical testimony by deposition makes practical sense because there is no witness demeanor for the trial court to observe, nor are there other intangible aspects to the testimony about which the trial court is exclusively aware. The problem with this standard of review is that it does place some additional responsibility on the reviewing court to independently analyze and evaluate the medical evidence offered by deposition. The author of the dissenting opinion has been reluctant to do so. See Larson v. CIGNA Ins. Co. (1996), [276 Mont. 283], 915 P.2d 863; McIntyre v. Glen Lake Irr. Dist. (1991), 249 Mont. 63, 813 P.2d 451. I have no similar reservations.
However, in this case, my differences with Justice Gray over the scope of our review of Workers’ Compensation Court decisions where the medical evidence has been provided exclusively by deposition is not critical to our decision. Whether we review this case based on the rule that we have repeatedly articulated, or simply for substantial evidence, as the dissenters would prefer, there is absolutely no basis for upholding the Workers’ Compensation Court’s finding that Edward Killoy, Jr., is employable.
The dissent contends that Killoy offered no medical evidence that he was physically'incapable of regular employment. However, that is not correct. Exhibit No. 4, admitted at the time of trial, consisted of medical records from Bruce E. Knutsen, M.D., who initially treated Killoy for his injury. The records included Dr. Knutsen’s February 28, 1994, report, which was issued at the request of the insurance adjuster shortly after Killoy’s aggravation of his injury. In that report he stated that:
I suspect Mr. Killoy will be disabled from his laboring type profession as I have attempted to send him back on two different occasions. He has been able to work reasonably well, although he continues with neck pain. Sometimes the slightest little neck jolt *98 or bump on the head will markedly aggravate his chronic neck pains.
At this point, I have suggested he go back and get a second opinion from Dr. Richard Dewey who he saw previously to see if there is anything else Dr. Dewey may be able to offer him in the way of surgical correction. If not, he may be on permanent disability. I just do not think he can continue in a laboring profession.
Edward Killoy did go back to Dr. Dewey who examined him and issued a report to Dr. Khutsen regarding his observations on April 18, 1994. That report was admitted without objection at trial as Exhibit No. 1. In that report he stated:
Edward is really unchanged. He continues to have significant muscular symptoms in the back, shoulders, base of the skull. Hands go to sleep at night although not in the ulnar distribution and he has not made any improvement. The symptoms he is having are related to the amount of heavy work that he does. It is my opinion that he could not return to his usual occupation with Rhone Poulene [sic] but could return to a lighter occupation if that can be worked out. If not, I think he should be medically retired. ...
The options are clear. Surgery will not relieve his muscular problems and will not relieve problems related to cervical spondylosis. These are aggravated by heavy work and lighter work is recommended. In the absence of that, his only option is medical retirement. He has the following problems: Cervical spondylosis, radiculopathy not identified; cervical stenosis, possible but not proven cervical radiculopathy; bilateral ulnar entrapment neuropathies; significant cervical myospasm. I do not feel he will get any better. He may worsen as time goes on and he cannot return to his usual occupation.
In response to the recommendations of Dr. Knutsen and Dr. Dewey that the possibility of lighter work be considered, or in the alternative, that Killoy be medically retired, his employer’s insurer hired Patricia Hink, a vocational consultant, who reviewed Killoy’s medical records, his educational and work background, and his physical limitations, and issued a report to his employer’s insurer on June 23, 1994. The report consists of ten pages and meticulously outlines Killoy’s work history, his education, his medical status, and his physical limitations. That report was admitted without objection as trial Exhibit No. 3. In that report, Hink concluded:
*99 Due to the persistent problems that Mr. Killoy has had in performing even normal daily functions, I felt that it was appropriate for him to apply for Social Security benefits. Given his age at 57 years which makes him an older adult, a 10th grade education, and a heavy to very heavy occupation which he has performed consistently since 1956, it would be difficult for Mr. Killoy to re-enter the work force even at unskilled jobs at this time.
At the present time Mr. Killoy remains off work and has applied for Social Security Benefits. I have encouraged him in this direction since his past relevant work has been heavy, to very heavy physical demand work. ... These skills do not easily transfer into lighter work, especially for an individual of his age, which is now 57. He has a limited formal education, however, he has obtained his GED through the Navy in 1955. Given the [severity] of the industrial injury that he has sustained and his persistent symptoms, he appears to be a favorable candidate for Social Security Benefits.
Hink’s report goes on to state that Killoy had reached maximum medical improvement but that his employer had no light-duty work for him and that he was a high risk for re-injury in the work place. She pointed out that he had difficulty sitting for any length of time and difficulty sleeping, which made any employment problematic.
The combination of Dr. Knutsen’s report, Dr. Dewey’s report, and Patricia Hink’s analysis of the medical records, as they apply to the field of vocational placement, clearly established by a preponderance of the medical evidence that Edward Killoy was unemployable. To suggest, as the dissent does, that he offered “no medical evidence that he did not have a reasonable prospect of physically performing regular employment” simply ignores the record. To suggest that the necessary quantum of medical proof requires that a doctor testify that in his or her opinion Killoy was “physically incapable of performing regular employment” confuses the function of medical evidence and vocational evidence. Doctors are not qualified to testify regarding vocational opportunities, they are merely qualified to testify regarding the nature of a patient’s injury and the physical restrictions that result from that injury. In this case, the medical evidence clearly established the nature of Killoy’s injury, that physical limitations resulted from that injury, and that Killoy’s pattern of pain was *100 consistent with his injury. Medical evidence can do no more. Somewhere common sense has to be applied.
The dissent argues that Dr. Dewey approved five positions for Killoy, and therefore, that the Workers’ Compensation Court’s opinion was supported by substantial evidence. However, the dissent’s characterization of Dr. Dewey’s testimony is out of context and incomplete. When specifically asked whether it was his opinion that Killoy was physically capable of performing the jobs which had been submitted to him and described for him by Patricia Hink, Dr. Dewey testified as follows:
No, I didn’t say that. I said he could. I didn’t know if he was capable of doing it. I very clearly caged myself on that record. I said, “Can safely be attempted without risk.”

...But if he was capable of doing them, I can’t answer that. That’s a question that doctors can’t answer; only the patient can answer that.

I know that’s not the answer you want to get. You want to get this thing absolutely black and white, but I can’t give you that answer. I can tell you whether there’s risk and no risk. And I can tell you that the patient should be able to perform those duties. Whether they can tolerate them or not, that’s a different story.
... I can only give you what is safe and what is unsafe. (Emphasis added.)
The dissent criticizes the majority opinion because:
Dr. Dewey did not opine that Killoy’s pain rendered him unable to perform the positions and, therefore, the Court’s reliance on our ability to determine the weight of medical deposition testimony, under Caekaert, is totally misplaced; there is simply no medical evidence of pain too severe to permit the performance of regular employment.
The dissent apparently did not consider Dr. Dewey’s testimony that neither he nor any other doctor can give the type of testimony that the dissenters would like to see. Ultimately, however, Dr. Dewey’s testimony is just common sense. The state of medical science has not yet advanced to the point where it can measure the degree of an individual’s pain, no matter how much the dissenters would like to reduce the evaluation process to a question of connecting the dots. For purposes of the result in this case, though, Dr. Dewey did testify that:
*101 His symptoms were very typical of that kind of an injury, and aggravation of — a muscular aggravation of something which, you know, for reasons we don’t quite understand, are quiet for a long time. ...
... Whether it’s the patient’s tolerance or not, his symptoms are certainly consistent with everything that happened to him, and he’s not alone in having this kind of problem.
In conclusion, Dr. Dewey gave the following relevant testimony, which was all the medical proof he could offer:
Q. By approving the job descriptions that were submitted to Patricia Hink, you were recommending that he could, without risk, attempt to work in those positions; is that correct?
A. That is correct. And I will read to you the paragraph which I specifically signed my name to.
“This job is physically compatible with this worker’s physical capabilities.” Doesn’t say anything about his tolerance, it says about his capabilities.
Q. We’re talking about tolerance, you’re referring to the level of pain that he may have to — or would incur if he attempted that?
A. For this patient, yes, that is correct.
Q. And the pain that he suffers is certainly consistent with the injury he sustained?
A. Yes.
Q. And is it consistent with his medical condition?
A. Yes.
Q. And you would defer to the patient his ability to tolerate those jobs?
A. Probably, in this case, yes, because I’ve seen him a number of times. If someone came in off the street and told me they couldn’t do that, I think I’d want to get a little bit better feeling for how that patient responds and whether the patient’s an appropriate or inappropriate responder.
Q. Did you, in this case, feel it is appropriate?
A. Yes.
The dissent’s conclusion that “Killoy’s subjective view of his pain does not constitute medical evidence” is therefore directly contradicted by the only medical evidence which could be offered. Killoy’s subjective view of his pain, as evaluated by his attending physician, *102 is the best evidence of his physical limitations. To hold otherwise is to ignore the medical evidence.
Because Dr. Dewey testified that whether Killoy could work would ultimately depend on whether he could tolerate work, and because the Workers’ Compensation Court found that Killoy’s testimony regarding the degree of his pain was credible, it is appropriate to review what he said in that regard.
He stated that he has pain from the base of his skull to the middle of his back and in both shoulders. His pain causes headaches on a continual basis. He has muscle spasms related to any physical activity. The muscle spasm occurs in his neck, back, shoulders, chest, and throat. Whenever that occurs he has to change positions. If he is sitting he has to stand; if he is standing he has to sit.
The pain in Killoy’s neck is constant and any kind of activity, including walking, prolonged sitting, sleeping, or standing makes the pain worse. Reaching aggravates his condition. When his pain is aggravated the severity of his headaches increases.
When Killoy does experience spasms, he has to apply cervical traction. This occurs an average of two to four times daily for up to ten minutes at a time. He also has to perform stretching exercises throughout the day.
During each week Killoy has one or two bad days where he sits in a recliner chair with a hot pad and “can’t do a hell of a lot” except try to get relief. He has almost quit fishing, he has quit hunting, and he no longer exercises, although he used to be a regular participant in programs at the YMCA.
Edward Killoy, who is the best judge of his physical tolerance, did not think there was any job he could perform for eight hours a day. To suggest that he can, demonstrates a total insensitivity to the requirements of regular employment.
One of the reasons Killoy has not attempted to return to employment is because, at Patricia Hink’s recommendation, he applied for and received social security disability benefits, which he would lose if he attempted to return to work that he does not think he can perform. What is unreasonable about that?
The Workers’ Compensation Court specifically found that:
Claimant testified that he experiences pain from the base of the skull, down the middle of the back and through his shoulders. He described his pain as constant. He has headaches and muscle spasm, which are aggravated by increased activity. He obtains temporary pain relief by using a stretching apparatus for his neck *103 and performing stretching exercises on a daily basis. He has his “bad days” once or twice a week. On those days, he seeks relief through hot showers and a heating pad. His level of pain increases if he is stationary for any length of time. Claimant’s testimony regarding his pain was credible.
In spite of Dr. Dewey’s testimony that Killoy’s ability to be employed would depend on his ability to tolerate the pain, and his further testimony that Killoy’s complaints of continuous pain were consistent with the nature of his injury, Patricia Hink did not even bother to submit the job descriptions that the employer now relies on to Killoy for his consideration before changing her opinion about his employability. She admitted that she did not know whether Killoy could tolerate the pain he would have to endure to perform the jobs she submitted. She did not arrange for him to attempt to perform any of those jobs. Neither did she arrange for a work-hardening program which would help him prepare to attempt those jobs. She did not even bother to discuss the jobs she was recommending with him. When asked by the court whether she thought Killoy was capable of full-time work, as opposed to part-time work, she simply said, “I would hope that he would be able to work at full-time work ....” However, when asked whether anyone would hire him if he explained to a potential employer all the physical limitations that he had testified to, she admitted that no one would.
The dissent characterizes the preceding summary of the evidence in this case as “bits and pieces” of the record. I disagree. However, the important point is that in spite of a diligent search I have been unable to find any “bits and pieces” of the record which support the judgment of the Workers’ Compensation Court or the dissent’s strained effort to affirm that judgment.
In summary, even if this Court applies the standard of review preferred by the dissent, there was no substantial evidence that Edward Killoy was physically capable of regular employment. All of the evidence, medical and otherwise, was to the contrary. The dissent’s insistence that there be medical evidence regarding the degree of Killoy’s pain ignores reality and the limitations of medical science. The dissent’s criticism of the majority’s reliance on Killoy’s own description of his pain ignores the fact that his attending physician testified that that was the only way in which his actual job prospects could be evaluated, and that the Workers’ Compensation Court found Killoy’s description of his pain credible. To suggest that, in light of the combined testimony of Dr. Dewey and Killoy, and the Workers’ *104 Compensation Court’s finding that Killoy was credible, there is no evidence of total disability defies common sense.
For these reasons, I conclude that Killoy proved his entitlement to permanent total disability benefits by a preponderance of the evidence and that there was not substantial evidence to support the Workers’ Compensation Court’s denial of those benefits.
I concur with the majority opinion.